[No. D045342. Fourth Dist., Div. One. July 6, 2005.]

In re S.W., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
R.R., Defendant and Appellant.

COUNSEL

Donna B. Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, and Christa G. Baxter, Deputy County Counsel, for Plaintiff and Respondent.

Linda M. Fabian, under appointment by the Court of Appeal, for Minor.

OPINION

**NARES, J.**—R.R. (Mother) appeals following the dispositional hearing in the dependency case of her daughter, S.W. She contends the juvenile court erred by ordering S.W. placed in foster care rather than with her maternal grandmother, Tonia R. (Grandmother). We affirm.

## I. PROCEDURAL BACKGROUND

On July 27, 2004, when S.W. was two and one-half years old, the San Diego County Health and Human Services Agency (the Agency) filed a dependency petition for her under Welfare and Institutions Code section 300, subdivision (b).[1] It alleged that S.W. was exposed to violent confrontations between Mother and her boyfriend, Eddie H., in the family home, and Mother used marijuana to excess. At the July 27 detention hearing, the court ordered S.W. detained in foster care, ordered the Agency to evaluate all appropriate relatives, and gave it discretion to detain S.W. with a relative upon 48 hours' notice to her attorney. On September 20, the court entered true findings on the petition. On September 27, it declared S.W. a dependent and placed her in a foster home.

## II. FACTUAL BACKGROUND

When Grandmother found out Eddie had injured Mother, she called Children's Protective Services (CPS). On July 12, 2004, Grandmother told an Agency protective services worker that around June 28, Mother left Eddie and went to Grandmother's home; Eddie came to the home and threatened to kill everyone; around July 9, Mother returned to him; Grandmother had seen S.W. with a black eye; both Mother and Eddie smoked marijuana and drank in front of S.W.; Mother hit S.W. and verbally abused her; and Grandmother believed S.W. was in danger. S.W.'s maternal aunt Melody M. (Aunt), who lived with Grandmother, also expressed her concerns to the protective services worker. Grandmother said she wanted to become S.W.'s guardian in order to protect her. S.W. was already spending weekends and at least one night during the week at Grandmother's home.

On July 30, 2004, Mother told social worker Jessica Newmyer she wanted S.W. to stay in her foster placement but agreed Grandmother could have visits. At the dispositional hearing, Mother testified she had not wanted S.W. placed with Grandmother because she was upset that Grandmother had called CPS.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

On August 1, 2004, Mother said she was happy with S.W.'s foster home placement and did not want her placed with family members. Mother disclosed she was in foster care at age 13 because Grandmother's boyfriend molested her,[2] but Grandmother did not believe she was being molested. Mother had been misbehaving at home and stealing money and was taken to the police station. She told the police about the molestation, which had been going on for two years. She remained in foster care until she turned 18 because she did not want to return home where she would have to follow Grandmother's rules. Aunt was in foster care for a short time then returned to Grandmother.[3]

On August 6, 2004, Newmyer told Mother she was evaluating Grandmother's home for placement. Mother said she preferred that S.W. remain in her foster home, but believed Grandmother and Aunt would take good care of her. Newmyer went to Grandmother and Aunt's home, where Aunt's boyfriend, Luis F. (Luis), and their one-year-old child, M.F., also lived. Aunt told Newmyer she worked nights and would be able to care for S.W. during the day while Grandmother worked. Aunt said she had never been molested and Grandmother's boyfriend had not molested Mother.

Newmyer asked Grandmother about her CPS history. According to Newmyer, Grandmother related the following. When Mother was 14 years old, she "was ditching school, stealing, lying, and running away." When she got into trouble with the police, she told a detective that Grandmother's boyfriend had been molesting her and Grandmother and Aunt knew about and had observed the molestation. Mother and Aunt were removed from Grandmother's custody, "although the allegations were false."[4] Grandmother went to counseling and soon reunified with Aunt but not with Mother. Mother did not want to return home and " 'manipulat[ed]' the system." The social workers told Grandmother she was "sick and in denial" although she had not said the allegations were false.[5] She believed the dependency system was currently treating her unfairly; her only intent was to protect S.W. and try to prevent her from being in the system.

Grandmother testified that when her CPS case was active, she did not believe her boyfriend had molested Mother, but nevertheless ended her relationship with him. Since "this situation [with S.W.] came up," Grandmother believed Mother's claim of molestation. On August 6, 2004, when

---

[2] All other references in the record indicate Mother was 14 years old when she entered the dependency system. The record does not reveal the identity of Grandmother's former boyfriend.

[3] Mother, born in February 1979, turned 18 in 1997 and is about five years older than Aunt.

[4] It is unclear from the context which allegations were false—the allegations of molestation, or the allegations that Grandmother and Aunt knew about and had observed the molestation.

[5] Again, it is unclear to which allegations this refers.

Grandmother told Newmyer she did not believe Mother was molested, this was in response to a question about her original belief, not her current belief.

Grandmother acknowledged she had a criminal record but believed this should not prevent placement. She testified she had a 14-year-old arrest for drug possession, which was "dropped"; she was convicted of a lesser offense, "unsafe housing," because there were drugs in her home; she was on probation for three years and drug tested for six months with all clean tests; she never used drugs; and she had no other arrests. Grandmother was married to S.S., who had a criminal record, but they were separated because they did not get along.[6]

By August 10, 2004, Mother was no longer angry at Grandmother and told Newmyer she wanted S.W. placed with Grandmother. Newmyer reported the Agency was in the process of evaluating Grandmother's home, but because she had "a criminal background and CPS history . . . , waivers [would] be needed."[7] By August 10, the Agency had scheduled supervised visits for Grandmother every other Sunday and had asked S.W.'s counsel to agree to unsupervised visits. By September 20, Grandmother was having unsupervised six-hour visits every Sunday. She was appropriate during visits and S.W. called her "mama." Grandmother telephoned S.W. almost every day; during the conversations, S.W. asked for her cousin, M.F.

On September 20, 2004, Newmyer reported a criminal records check revealed Grandmother was arrested on May 22, 1990, "for possession/purchase for sale narcotics/controlled substance." This charge was dismissed and she was convicted of allowing drug sales in her home, a felony. Regarding Grandmother's CPS history, Newmyer stated Grandmother "did not believe [Mother] at the time;" Grandmother "still denies that [Mother] was molested by her ex-boyfriend;" and Mother "was given the choice to return home or remain in foster care and she chose to remain in foster care." Luis, whose criminal record involved carrying a weapon on school grounds in 2001 and possessing marijuana in 2002,[8] had moved out of Grandmother and Aunt's home. Grandmother testified she intended to keep him out if S.W. was placed with her; she would obtain a restraining order and call the police if necessary; and he would have contact with M. F. outside the home. At the dispositional hearing, Newmyer testified she had not "officially"

---

[6] At the dispositional hearing, Newmyer testified S.S. told her he had served a prison sentence for drug possession and completed parole. Grandmother testified she had been separated from S.S. for eight months; his arrest and prison sentence occurred before she knew him; he had not been arrested or involved with drugs since she had known him; and he had been employed as a supervisor for five years.

[7] In this opinion, we use the word "exemption" as well as "waiver."

[8] The record does not say whether these were arrests or convictions.

begun evaluating Grandmother's home but found it to be a clean, organized two-bedroom apartment, with Grandmother in one bedroom and Aunt and M.F. in the other.[9]

Newmyer discussed Grandmother with a multicultural committee, an adoptions supervisor, and other supervisors and the recommendation was that S.W. remain in a foster home "until a suitable relative becomes available and approved for placement." Although Grandmother and Mother wanted S.W. placed with Grandmother, Newmyer said this was "against [A]gency policy" and it was "unlikely that [Grandmother] would qualify to adopt" if reunification failed. Newmyer testified that factors in the decision not to approve Grandmother's home were her criminal and CPS histories; her disbelief that Mother had been molested, which raised concerns about her ability to protect and about men with whom she might become involved; her failure to reunify with Mother; and Mother's desire, as a teenager, to remain in foster care rather than return home.

Agency supervisor Martin testified she had never met Grandmother or seen her home, but was impressed by her bond with S.W., frankness and cooperation with the Agency, consistent concern for S.W.'s safety, and efforts to protect S.W. Nevertheless, Martin declined to approve Grandmother's home for placement due to her CPS and criminal histories and Luis's criminal history. Martin believed the issues from Mother's dependency were unresolved, complicating S.W.'s placement with Grandmother. According to Martin, when Mother was removed from Grandmother as a teenager, Grandmother did not believe the molestation allegations, demonstrate an ability to protect, or reunify with Mother, although there were reasons for the lack of reunification such as Mother's "teenage problems" and Grandmother did reunify with Aunt. Martin admitted Grandmother participated in therapy, but did not know if she participated in conjoint therapy with Mother or in any other services. Grandmother, however, testified she attended individual counseling and conjoint counseling with Mother and participated in parenting education.

Another reason Martin would not approve the placement was Grandmother's "pattern of dating [unsafe] men," that is, over a 10-year period she had a relationship with the boyfriend who was accused of molesting Mother and a relationship with S.S., who had served a prison sentence for a drug-related offense, and with whom she was still "involved . . . to some degree" despite their separation.[10] Martin's final reason for withholding her approval was

---

[9] Agency supervisor Karen Martin testified that the Agency's procedure was to evaluate homes after the criminal and child abuse background checks.

[10] Martin did not explain her assertion that Grandmother was still involved with S.S. and there is no other evidence in the record of supporting the assertion.

that, according to the adoptions unit, which had not yet evaluated the home, it was not likely to be approved for adoption if reunification failed.

## III. THE HEARING AND THE RULING

At the hearing, S.W.'s attorney joined in Mother's request that the juvenile court place S.W. with Grandmother. S.W.'s appellate counsel agrees with trial counsel's position and argues the judgment should be reversed, but no notice of appeal was filed on S.W.'s behalf.

In denying placement with Grandmother, the juvenile court said while it believed the independent judgment test applied, it would make the same decision under the abuse of discretion test; the Agency "carefully considered and balanced" the factors in section 361.3; there was no abuse of discretion; and "my independent judgment would not be different because I do believe I need to rely upon [the Agency's] expertise and the information regarding the examination of the case and the investigation of the case to make that placement."

## IV. DISCUSSION

### A. *Section 361.3: the Relative Placement Preference*

■ When a child is removed from parental custody at the dispositional hearing, a relative requesting custody is entitled to preferential consideration (§ 361.3, subd. (a)), that is, "the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) "In determining whether placement with [the] relative is appropriate, the county social worker and court shall consider, but shall not be limited to," certain listed factors. (§ 361.3, subd. (a).)

Mother contends the juvenile court failed to state reasons for its denial of placement with Grandmother as mandated by section 361.3, subdivision (e). She further contends the Agency's recommendation against the placement violated section 361.3, subdivision (a)(7)(H) because it was based solely on the premise that it would not provide S.W. legal permanency if reunification failed. She also contends the juvenile court failed to exercise its independent judgment regarding the placement and improperly employed the abuse of discretion standard. Because Grandmother had a criminal conviction and a child abuse history, section 361.3 does not control our analysis, Mother's contentions are inapposite, and a consideration of section 361.4 and related law, discussed below, is necessary.

■ Mother additionally contends S.W.'s foster care placement violates Mother's statutory and due process rights to reasonable reunification services

and her right to family unity and integrity. The cases on which Mother relies are not on point as they do not concern section 361.4. (*In re Baby Girl D.* (1989) 208 Cal.App.3d 1489 [257 Cal.Rptr. 1]; *In re Monica C.* (1994) 31 Cal.App.4th 296 [36 Cal.Rptr.2d 910]; *In re Daniel D.* (1994) 24 Cal.App.4th 1823 [30 Cal.Rptr.2d 245]; *In re Jessica Z.* (1990) 225 Cal.App.3d 1089 [275 Cal.Rptr. 323]; *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023 [111 Cal.Rptr.2d 243].) Moreover, "[p]lacement with a relative is not tantamount to family preservation." (*In re Jasmine T.* (1999) 73 Cal.App.4th 209, 213 [86 Cal.Rptr.2d 128].) Nor is Mother assisted by her claim that "[f]oster care . . . in practical effect will serve to almost guarantee the termination of [M]other's parental rights [and] will ensure that [M]other does not have daily contact with [S.W.]" In August 2004, Mother told the social worker she wanted to reduce her visitation with S.W. from two days a week to one.

B. *Section 361.4 and Health and Safety Code Section 1522: Criminal and Child Abuse History*

1. *The statutes and regulations*

■ Before a child is placed in a relative's home, the social worker must institute a criminal records check and a "Child Abuse Index" check. (§ 361.4, subds. (a), (b), (c).) The Child Abuse Index check includes "the review of the investigation report and file prepared by the child protective agency which investigated the child abuse report." (Health & Saf. Code, § 1522.1; see Health & Saf. Code, § 361.4, subds. (a) & (c); Cal. Code Regs., tit. 22, §§ 80019.2, subd. (a)(2), 89219.2, subd. (a)(2)).) The criminal records check entails "a state and federal level criminal records check to be conducted by an appropriate governmental agency . . . ." (§ 361.4, subd. (b).)

■ "If the criminal records check indicates that the [relative] has been convicted of a crime that would preclude licensure under Section 1522 of the Health and Safety Code, the child may not be placed in the home, unless a criminal records exemption has been granted by the county, based on substantial and convincing evidence to support a reasonable belief that the person with the criminal conviction is of such good character as to justify the placement and not present a risk of harm to the child pursuant to paragraph (3)." (§ 361.4, subd. (d)(2).)[11] Section 361.4, subdivision (d)(3) provides, in pertinent part, "[t]he county shall evaluate individual criminal records in

_____

[11] Section 361.4 was amended, effective October 2001, to allow a county to grant exemptions if the director of the California Department of Social Services gives it permission to do so. (§ 361.4, subd. (d)(3)(A), as amended by Stats. 2001, ch. 445, § 1); see also Health & Saf. Code, § 1522, subd. (h)(3)(B); *In re Hanna S.* (2004) 118 Cal.App.4th 1087, 1091 [13 Cal.Rptr.3d 338].) San Diego County was granted this permission immediately; "the Agency, as an arm of San Diego County, ha[s] the authority to grant . . . exemption[s]." (*In re Hanna S., supra,* at

accordance with the standards and limitations set forth in paragraph (1) of subdivision (g) of Section 1522 of the Health and Safety Code, and in no event shall the county place a child in the home of a person who is ineligible for an exemption under that provision."

Health and Safety Code section 1522 concerns the prelicensure criminal history investigation for foster family homes and other entities. "Before issuing a license . . . , the . . . approving authority shall secure from an appropriate law enforcement agency a criminal record to determine whether the applicant . . . has ever been convicted of a crime other than a minor traffic violation . . . ."[12] (Health & Saf. Code, § 1522, subd. (d)(1).) Any such record "shall be taken into consideration when evaluating a prospective applicant." (Health & Saf. Code, § 1522, subd. (d)(3).) "If the applicant . . . ha[s] convictions that would make the applicant's home unfit . . . the license . . . shall be denied." (Health & Saf. Code, § 1522, subd. (d)(4)(A).) It shall also be denied "[i]f . . . the applicant . . . has been convicted of a crime other than a minor traffic violation," unless an exemption is granted pursuant to Health and Safety Code section 1522, subdivision (g). (Health & Saf. Code, § 1522, subd. (d)(7).)

Under Health and Safety Code section 1522, subdivision (g)(1), an exemption may be granted, after review of the record, if there is "substantial and convincing evidence to support a reasonable belief that the applicant and the person convicted of the crime, if other than the applicant, are of such good character as to justify issuance of the license . . . or granting an exemption for purposes of subdivision (c)."[13] (Health & Saf. Code, § 1522, subd. (g)(1).)

### 2. *Analysis and case law*

Grandmother's CPS history began in 1992 or 1993, when Mother, then 13 or 14 years old, reported that Grandmother's boyfriend molested her. Mother was in foster care until 1997, when she turned 18, because she refused to return home, although her troubled relationship with Grandmother had improved by the time of S.W.'s dispositional hearing. The record contains no

---

p. 1091.) Previously, only the California Department of Social Services could grant exemptions. (*Ibid.*) The California Department of Social Services "monitor[s] county implementation of the authority to grant an exemption . . . to ensure that the county evaluates individual criminal records and allows or disallows placements according to the standards set forth in paragraph (1) of subdivision (g) of Section 1522 of the Health and Safety Code." (§ 361.4, subd. (d)(3)(B).)

[12] Also listed are arrests for certain offenses not at issue here.

[13] Health and Safety Code section 1522, subdivision (c) concerns the fingerprinting of specified persons and exemptions for those persons. Factors to be considered in granting an exemption are listed in California Code of Regulations, title 22, sections 80019.1, subdivisions (e) and (f), and 89219.1, subdivision (b). Exemptions are prohibited or limited for certain listed offenses, not at issue here. (Health & Saf. Code, § 1522, subd. (g)(1)(A), (B).)

details of the molestation or any allegations of a dependency petition; no statement what allegations were substantiated; varying accounts as to when Grandmother came to believe Mother's molestation claim; and no information from the Agency about the services in which Grandmother participated. It is therefore unclear whether the Agency reviewed the report and file from the dependency case as required by Health and Safety Code section 1522.1. That question, however, is not dispositive, as the Agency did conduct a criminal records check.[14]

■ The criminal records check revealed Grandmother's May 22, 1990 arrest "for possession/purchase for sale narcotics/controlled substance" and ensuing felony conviction "of keep[ing a] place to sell/etc. controlled substance." When a relative seeking placement has a record of criminal convictions, an Agency social worker, such as Newmyer, may request an exemption from her supervisors. (*In re Hanna S., supra,* 118 Cal.App.4th at pp. 1090–1093.) The Agency "plays a 'hybrid' role in dependency proceedings, exercising both executive and judicial functions." (*In re Ashley M.* (2003) 114 Cal.App.4th 1, 7 [7 Cal.Rptr.3d 237].) Its decision not to grant an exemption for a criminal conviction is an executive one (*In re Miguel E.* (2004) 120 Cal.App.4th 521, 540 [15 Cal.Rptr.3d 530]), subject to administrative review (Health & Saf. Code, §§ 1526, 1551; Cal. Code Regs., tit. 22, §§ 80040, 89240).

■ "[S]ection 361.4 does not authorize a juvenile court to grant an exemption for a disqualifying criminal conviction." (*LA III, supra,* 126 Cal.App.4th at p. 152; see *Los Angeles County Dept. of Children & Fam. Services v. Superior Court* (2001) 87 Cal.App.4th 1161 [105 Cal.Rptr.2d 254] (*LA I*).) Rather, it gives the California Department of Social Services and its delegates the exclusive authority to do so. (*LA III, supra,* 126 Cal.App.4th at p. 151.) In the case of "a determination under . . . section[] . . . 361.4, concerning placement of a dependent child with nonparental relatives . . . the Legislature has given [the Agency] the express authority to veto the placement under certain circumstances." (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 796 [20 Cal.Rptr.3d 336].) Here, the Agency was exercising its executive power, not judicial power. Mother is therefore incorrect in her

---

[14] Mother argues there is no evidence the Agency conducted the fingerprint clearance check required by section 361.4. This argument is of no avail. While section 361.4 still requires a fingerprint clearance check following the criminal records check (§ 361.4, subd. (b)), "the prohibition against placement of a dependent child in the home of a convicted felon [now] arises upon receipt of a negative criminal records check [(§ 361.4, subd. (d)(2))]." (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2005) 126 Cal.App.4th 144, 153, fn. 4 [24 Cal.Rptr.3d 256] (*LA III*).) Formerly, it "[did] not arise until the criminal records check [was] confirmed by a fingerprint clearance check." (*Ibid.*) Now, "there [is] no occasion for the juvenile court to concern itself with the results of the subsequent fingerprint clearance check . . . ." (*Ibid.*)

assertion there is a separation of powers violation. Additionally, because only the Agency, and not the juvenile court, had the authority to grant an exemption to allow S.W.'s placement with Grandmother, the Agency did not forfeit the right to make this argument by failing to do so in the juvenile court. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293–1294 [13 Cal.Rptr.3d 786, 90 P.3d 746].)

### 3. *LA I*

In *LA I, supra,* 87 Cal.App.4th 1161, after the children were detained, the juvenile court ordered the Los Angeles County Department of Children and Family Services (DCFS) to conduct a "pre-release investigation" of their great-uncle and his wife for possible placement. (*Id.* at p. 1163.) DCFS recommended against release to the great-uncle due to his criminal and drug use history and health problems. The court ordered the children released to the wife with monitored contact for the great-uncle, sustained the dependency petition, and ordered the children remained released to the wife. DCFS filed a petition for a writ of mandate and the reviewing court ordered the juvenile court to change its placement order. (*Id.* at p. 1164.) The juvenile court ordered the great-uncle to move out of the home. (*Id.* at pp. 1164–1165.) After the social worker found the great-uncle in the home, the reviewing court issued an alternative writ directing the juvenile court to remove the children from the wife's home and/or bar contact between the children and the great-uncle. (*Id.* at p. 1165.) Following the permanency planning hearing, DCFS informed the reviewing court that the juvenile court had granted the wife guardianship. (*Ibid.*)

The *LA I* reviewing court noted that under the version of section 361.4, subdivision (d)(2) then in effect, if the fingerprint clearance check following the criminal records check disclosed a conviction for a crime that would preclude licensure under Health and Safety Code section 1522, the children " 'shall not be placed in the home.' "[15] (*LA I, supra,* 87 Cal.App.4th. at pp. 1165–1166, italics omitted.) It held while section 361.4, subdivision (d)(3) allowed DCFS to seek a waiver and the director of the Department of Social Services to grant one, the juvenile court did not have authority to grant a waiver (*id.* at pp. 1166–1167) and DCFS's failure to seek one was not an abuse of its discretion (*id.* at pp. 1167–1168).[16] The *LA I* court stated: "The general 'best interest of the child' standard cannot supplant the specific

[15] In 2004, "shall" was replaced with "may" in section 361.4, subdivision (d)(2). (Stats. 2004, ch. 373, § 5.)

[16] Both Mother and the Agency cite *In re Jullian B.* (2000) 82 Cal.App.4th 1337 [99 Cal.Rptr.2d 241]. That case dealt with interplay between the preferences of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) for placement with an Indian relative, and the restrictions of section 361.4, subdivision (d)(2), in a situation where child's Indian relative had criminal convictions. There, the social services department did not request an exemption. (*In re Jullian B., supra,* 82 Cal.App.4th at pp. 1349–1350.) Thus, *In re Jullian B.* is distinguishable

prohibition in section 361.4. [Citation.] Furthermore, section 361.4 represents the Legislature's determination that it would *not* be in the best interest of the dependent child to be placed with a relative with a disqualifying criminal conviction.[17] The author of the Lance Helms Child Safety Act, of which section 361.4 is a part, sought to address the dangers faced by children in the dependency system and anticipated that enacting this statute would help to protect children and provide them with a safe environment while in the system. [Citation.]" (*LA I, supra,* 87 Cal.App.4th. at p. 1168; accord, *LA III, supra,* 126 Cal.App.4th at p. 150.)

Reconciling section 361.4, subdivision (d)(2) with the version of section 319, subdivision (d) then in effect (now § 319, subds. (d)(2) and (f)),[18] the *LA I* court noted section 319, subdivision (d) gave the juvenile court "discretion to place a detained child in a 'suitable home of a relative' " and "direct[ed] that the court 'shall' consider the department's recommendation based on the assessment of suitability, including a criminal records check," while "[s]ection 361.4[, subdivision (d)(2)] constitute[d] a declaration that a home in which a person with a criminal record is living is not suitable." (*LA I, supra,* 87 Cal.App.4th. at pp. 1168–1169, italics omitted.) The reviewing court granted DCFS's petition for writ of mandate and directed the juvenile court to vacate its guardianship and placement orders and enter a new order removing the children from the wife's home and placing them in a suitable home. (*Id.* at p. 1171.)

Mother argues *LA I* is distinguishable because it concerned a section 319, subdivision (d) detention with a relative who had disqualifying criminal convictions, not a section 361.3 placement, and because the relative there was not on the statutory list of relatives entitled to preferential consideration (§ 319, subd. (f), 2d par.). Section 361.3 is not dispositive here, as noted above, nor is Mother's latter point relevant to the *LA I* court's decision.

In her reply brief, Mother attempts to distinguish *LA I* on the basis that DCFS did not seek a waiver of the great-uncle's criminal record, so the reviewing court did not decide whether the juvenile court had the authority to review the decision on a waiver request. The *LA I* court did, however, expressly state that the juvenile court lacked authority to grant a waiver. Also in her reply brief, Mother argues the Agency abused its discretion by failing

from the instant case. (*LA I, supra,* 87 Cal.App.4th at pp. 1169–1170 [discussing why *In re Jullian B., supra,* 82 Cal.App.4th at p. 1337 was not controlling].)

[17] Because this best interest determination is inherent in section 361.4, Mother's assertion that S.W.'s best interest required placement with Grandmother is essentially a request that this court disregard the Legislature's intent.

[18] Section 319, subdivisions (d)(2) and (f) provide for detention with a relative whose home has been assessed.

to seek a waiver of Grandmother's conviction. There are two defects in this argument. First, social worker Newmyer sought a waiver from her superiors, which is the proper procedure. (*In re Hanna S., supra,* 118 Cal.App.4th at pp. 1091–1093.) Second, mother's opening brief does not expressly contend the Agency abused its discretion by failing to seek a waiver.[19] (*Id.* at p. 1090 [Where appellant raised "only the asserted failure of the Agency to request an exemption . . . we are limited to reviewing only that issue"].)[20]

## C. *Conclusion*

This dependency case originated because Grandmother called CPS. With that call, she sacrificed much of her own privacy and jeopardized her relationship with Mother. In her ensuing dealings with the Agency and the juvenile court, Grandmother was forthcoming and forthright. In her relationship with S.W., she remained loving and devoted. In short, she placed S.W.'s protection above all else. Nevertheless, under the applicable law, set forth above, the juvenile court did not have the authority to place S.W. with Grandmother in the face of the Agency's denial of an exemption for her

[19] Mother's opening brief does contain two oblique references to this issue. First, it states: "There was no explanation for the worker's conclusion that [Grandmother] would not qualify to adopt [S.W.] If the Agency were to request and receive a waiver to place [S.W.] with [Grandmother], pursuant to section 361.4, it could be assumed that [Grandmother] would also have qualified to adopt [S.W.]." The opening brief also states: "The Agency's peremptory rejection of [Grandmother] was not a reasonable effort to place the child with a relative or to balance [Mother]'s and [S.W.]'s needs for a continued relationship. The Agency did not evaluate [Grandmother]'s home. The Agency did not obtain records regarding the old protective services matter and did not obtain the records regarding [Grandmother]'s old conviction." The latter quotation is inaccurate; the Agency did conduct a criminal records check, which revealed the conviction.

[20] In *In re Hanna S., supra,* 118 Cal.App.4th 1087, a child who had been freed for adoption appealed, contending "the juvenile court should have determined [the Agency] abused its discretion because the social worker never sought an exemption" that would allow her to be placed with her aunt, who had criminal and CPS records, and her uncle, who had a criminal record. (*Id.* at pp. 1088–1089.) This court affirmed the juvenile court's order because the record established that the social worker did seek an exemption. (*Id.* at pp. 1091–1093.) Acknowledging the "abundant evidence in the record that would have supported the granting of an exemption," this court stated: "[O]nce a child has been freed for adoption, the juvenile court's powers are limited to reviewing whether the Agency has abused its discretion in placing the child. [Citation.] The court had no discretion to disregard the necessity for an exemption. It could not order the Agency to place Hanna with [the aunt and uncle] without a waiver of the criminal records and CPS records that disqualified them for licensure because if an exemption is not granted, then the home is deemed not 'suitable' under section 361.4. [*LA I, supra,* 87 Cal.App.4th at p. 1170.]" (*In re Hanna S., supra,* 118 Cal.App.4th at p. 1092.) While *In re Hanna S., supra,* 118 Cal.App.4th 1087, is instructive regarding the exemption procedure, it is distinguishable from the instant case in that it arose after termination of parental rights and it concerned the Agency's asserted failure to seek an exemption, not its failure to grant one.

criminal conviction.[21] (*LA I, supra,* 87 Cal.App.4th at p. 1170, fn. 10 ["While there is evidence supporting the court's *finding* that [the relatives] are responsible, caring, and forthcoming, these facts are irrelevant to the court's task because [section 361.4, subdivision (d)(2)] does not authorize the court to exercise its discretion to place the children . . . in a home with someone who has a disqualifying criminal conviction, absent a waiver . . . ."]; see *In re Hanna S., supra,* 118 Cal.App.4th at p. 1092.) We therefore must affirm the juvenile court's order.

## DISPOSITION

Judgment affirmed.

Huffman, Acting P. J., and O'Rourke, J., concurred.

A petition for a rehearing was denied August 26, 2005, and appellant's petition for review by the Supreme Court was denied October 12, 2005.

---

[21] Because there is no evidence in the record Luis's criminal history included a conviction, his record did not preclude S.W.'s placement with Grandmother under section 361.4. (§ 361.4, subd. (d)(2); see also Health & Saf. Code, § 1522, subd. (e).)