Filed 8/2/13  In re J.G. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.G., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>M.H. et al.,<br><br>        Defendants and Appellants. | A137054<br>(Alameda County<br>Super. Ct. No. HJ11016655) |

**I.**

**INTRODUCTION**

Appellant M.H., the biological father of minor J.G., appeals juvenile court findings and orders terminating his parental rights over minor under Welfare and Institutions Code section 366.26[1] and choosing adoption as the preferred permanent plan. On appeal he primarily claims "the Agency failed in its duty to notify father of dependency proceedings."  Appellant asks the court to reverse and remand with orders that he be provided reunification services and that minor be placed in the care of her paternal relatives.  Minor's mother, J.D.G., also appeals from the order terminating her parental rights.  She joins appellant's appeal and argues that if this court reverses the

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

1

order terminating his parental rights, the order terminating her rights should be reversed as well. We affirm.

## II.

## FACTS AND PROCEDURAL HISTORY

Minor was born in March 2011. Hospital staff was concerned for minor's wellbeing as mother appeared mentally unstable. She attempted to cut the security bracelet from minor's leg, causing the alarm to sound in the hospital. Police were called. Minor was placed in protective custody and was released from the hospital into the custody of her foster parents, where she has remained throughout these proceedings.

The Alameda County Social Services Agency (the Agency) filed a dependency petition on March 28, 2011. The petition contained allegations that mother suffered from mental illness and was on a section 5150 hold.[2] It was also alleged that mother had a history of domestic violence. The identity of minor's father was allegedly unknown.

Mother was questioned before the juvenile court on April 12, 2011, about the identity of minor's father. Mother claimed she knew him only by the name N.C, also known as "Shady." She stated she never lived with Shady, and she only saw Shady one time after she became pregnant, perhaps in her seventh or eighth month of pregnancy. County counsel questioned mother specifically about appellant. Mother acknowledged appellant was her ex-boyfriend but denied he was minor's father, claiming she did not have sex with him around the time of conception.

On May 3, 2011, the juvenile court held a combined jurisdiction/disposition hearing. The court sustained the dependency petition, continued minor's placement out of mother's custody, and offered mother reunification services.

On November 7, 2011, the juvenile court held a six-month review hearing. Mother had refused to engage in reunification services and had displayed erratic, threatening behavior, resulting in her visitation with minor being suspended. The social

---

[2] Section 5150 provides that a person who is a danger to him/herself or others as a result of mental disorder may be taken into custody and placed in an approved facility for 72-hour treatment and evaluation.

worker and minor's foster parents had obtained restraining orders against her. The juvenile court followed the Agency's recommendation and terminated reunification services and scheduled a permanency planning hearing pursuant to section 366.26.

Despite mother's in-court statements denying appellant was minor's father, she told the social worker during a supervised visit on December 7, 2011, that minor's father had hit her in the stomach and in the head while she was pregnant with minor and she had obtained a restraining order against him. As a result of this beating during her seventh or eighth month of pregnancy, mother was hospitalized for two weeks and appellant was arrested and incarcerated. Considering mother's new disclosure in light of the police reports describing the incident, the Agency named appellant as an alleged father in a due diligence report.

An absent parent search was conducted and appellant was eventually contacted by telephone. He returned the call and provided a current address. According to appellant, mother had told him minor was not his child. During the phone conversation with the Agency's social worker, appellant said he was involved with mother around the time of conception. He wanted paternity testing; and if the testing came back positive, he wanted minor placed with him.

Appellant first appeared in court on January 25, 2012, and counsel was appointed to represent him. He was ordered to undergo paternity testing to determine if he was minor's biological father. He was also informed of the dates and nature of upcoming hearings, including the section 366.26 hearing, and was admonished to attend.

After not showing up for several scheduled blood tests, appellant eventually underwent paternity testing on February 20, 2012. The paternity test results indicated there was a 99.99 percent chance he was minor's biological father.

Appellant did not attend the hearing on March 1, 2012. Appellant also failed to attend several other scheduled hearings on March 9th and 16th. On April 5, 2012, appellant appeared in court with counsel. Separate guardians ad litem were appointed for mother and for appellant at the requests of their respective counsel. The Agency was granted discretion to arrange for supervised visits for appellant. The Agency's social

3

worker had several telephone conversations with appellant regarding visitation. Despite his initial ambivalence, he indicated he would like to have visits with minor but did not know when he would like to visit. He eventually had one supervised visit with minor on June 28, 2012. He did not request any more visits, and it is undisputed he does not have a relationship with minor.

At the status review hearing held on April 24, 2012, appellant did not appear in court except by counsel and his guardian ad litem. His counsel indicated she had not been able to contact him.

On June 18, 2012, appellant petitioned pursuant to section 388, seeking reunification services and consideration of placement of minor with paternal relatives "during his reunification."[3] He contended that the Agency failed to provide him notice in a timely fashion and this lack of notice effectively deprived him of an opportunity to participate in reunification services and to effectively challenge the termination of his parental rights. The court ordered the matter be set for a contested hearing.

Appellant was incarcerated as of August 3, 2012. On August 9, 2012, the juvenile court held the contested section 388 proceeding. Appellant appeared in custody and presented evidence in support of his section 388 petition arguing the Agency's failure to give him timely notice, in addition to the mother hiding his paternity from him, deprived him of the ability to receive services and reunify with the minor.

The court denied appellant's section 388 petition. The court also denied appellant's request to have minor placed with her paternal grandmother in Chicago and to grant him six months of reunification services.

The court proceeded with the section 366.26 hearing. Appellant did not appear except by counsel and his guardian ad litem. At the close of this proceeding, the court

---

[3] "[A] biological father is not entitled to custody under section 361.2, or reunification services under section 361.5 if he does not attain presumed father status prior to the termination of any reunification period, [but] he may move under section 388 for a hearing to reconsider the juvenile court's earlier rulings based on new evidence or changed circumstances." (*In re Zacharia D.* (1993) 6 Cal.4th 435, 454-455, fn. omitted (*Zacharia D.*).)

4

found minor adoptable, and indeed likely to be adopted by her foster parents. The court also found appellant had failed to establish the applicability of any statutory exception to adoption as the legislatively preferred permanent plan. The court terminated appellant's paternal rights and designated minor's foster family to be her prospective adoptive parents. Mother and appellant have each appealed from this ruling.

## III.

## DISCUSSION

### A. Notice of Juvenile Court Proceedings

On appeal appellant primarily claims the "juvenile court failed in its ongoing duty to inquire into paternity, and the Agency failed in its duty to ensure proper, timely notify [*sic*] father of dependency proceedings." He argues that mother's denial of his paternity during the early stage of the dependency proceeding "was all an obvious charade . . . which the juvenile court and the Agency should have seen through, but neither the court nor the Agency picked up on the clear fact that regardless of the existence or non-existence of 'Shady,' [appellant] was clearly an alleged father." He points out that as early as "March 2011 the Agency was in possession of police reports involving alleged incidents of domestic violence between mother and father—reports containing [appellant's] name, telephone number, address, and mother's statements naming [appellant] and admitting she was trying to hide his paternity from him because . . . 'I want to get rid of him.' " Furthermore, he contends the juvenile court infringed on his constitutional due process rights when it denied his section 388 petition because the lack of timely notice of the dependency proceedings. He argues that this lack of notice deprived him of "a fighting chance to show what a good father he is capable of being *during* the reunification period, as compared to in the post-reunification period, where he faced the more daunting and burdensome hurdles of filing and proving a section 388 petition."

The problem with these arguments is that they run headlong into a record replete with evidence that appellant knew he could be minor's father long before the Agency established contact with him. A man has "inquiry notice that he may have fathered a

5

child as a result of his sexual relationship with [a woman]." (*In re Emily R.* (2000) 80 Cal.App.4th 1344, 1354.) While chiding the Agency because it "knew mother and father were in an intimate relationship preceding and following mother's impregnation," appellant ignores the fact that he undoubtedly was in possession of the identical information. There is no allegation mother did anything during her pregnancy to preclude appellant from discovering their sexual relationship had resulted in the conception of a child.

Later, appellant went to see mother when she was seven or eight months pregnant, only to beat her so severely that she had to be hospitalized for two weeks. He wrote a letter of apology that was entered into evidence, but did not bother to inquire about the effect of the beating on mother's pregnancy.

This case is similar to *Zacharia D.*, *supra*, 6 Cal.4th 435, where a biological father, who did not declare his paternity in a dependency proceeding until the 18-month review hearing, could not excuse his lack of diligence in assuming his parental responsibilities by arguing he had no notice that his sexual relationship with the child's mother had resulted in a pregnancy. The court reasoned, "There is no evidence that he had any reason to expect that this sexual relationship [over a two-week period] *had not* resulted in pregnancy. . . . There is also no evidence that Wendy ever hid herself, her pregnancy, or their child from Javan." (*Id.* at p. 452, italics added.)

Therefore, it is of no legal significance that mother may have initially told the Agency and the court that appellant was not minor's father, or that appellant should have been contacted by the Agency sooner because he was identified as the father in police reports describing his physical assault on the pregnant mother. In briefing this appeal, appellant acknowledges he " suspected all along that he was [minor's] father, and told both his parents so . . . ." Consequently, it was appellant's burden to discover the existence of his child, or risk losing the opportunity to transform a biological link into a parent-child relationship. *(Zacharia D.*, *supra*, 6 Cal.4th at p. 452.)

We also find without merit appellant's argument that the court violated his constitutional due process rights, claiming he is a father as described in *Adoption of*

*Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*). In *Kelsey S.* the Supreme Court held "[t]he biological connection between father and child is unique and worthy of constitutional protection if the father grasps the opportunity to develop that biological connection into a full and enduring relationship." (*Id*. at p. 838.) The court held that if a "father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Id*. at p. 849.)[4]

In *Adoption of Michael H.* (1995) 10 Cal.4th 1043, the Supreme Court further clarified that "an unwed father has no federal constitutional right to withhold consent to an at-birth, third party adoption under our decision in *Kelsey S.*, *supra*, 1 Cal.4th 816, unless he shows that he promptly came forward and demonstrated as full a commitment to his parental responsibilities as the biological mother allowed and the circumstances permitted within a short time after he learned or reasonably should have learned that the biological mother was pregnant with his child." (*Adoption of Michael H.*, at p. 1060.)

At trial, appellant's counsel conceded that he did not qualify as a *Kelsey S.* father. Consequently, appellant has waived his right to complain that he was not so designated. (*In re Jason L.* (2009) 175 Cal.App.4th 922, 932.)

Even if we did not find waiver, this record does not support a finding that appellant qualifies as a *Kelsey S.* father. In determining whether a biological father is a *Kelsey S.* father, our Supreme Court delineated the factors that should be considered in determining whether a father has demonstrated "a full commitment to his parental responsibilities." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) The court should consider his conduct before and after the child's birth, including whether he publicly acknowledged

---

[4] Although decided in the context of a private adoption proceeding, the constitutional rationale of *Kelsey S.*, *supra*, 1 Cal.App.4th 816 has been found to be equally applicable in the context of dependency proceedings. (*In re Jerry P*. (2002) 95 Cal.App.4th 793, 810-812; *In re Julia U*. (1998) 64 Cal.App.4th 532, 540-541.)

paternity, paid pregnancy and birth expenses according to his ability to do so, and promptly took legal action to obtain custody of the child. (*Ibid.*)

Looking at the record in this case, there is no evidence appellant provided any emotional, medical, financial or other support during the mother's pregnancy. Instead, the record shows that after appellant learned or reasonably should have learned that the mother was pregnant with his child, he beat her so severely that she had to be hospitalized for two weeks. Even after appellant took a paternity test confirming he was minor's biological father, he visited minor only once during a 10-month period, did not keep the Agency or his counsel apprised of his whereabouts, missed numerous court hearings, and exhibited no commitment to establishing any type of relationship with minor.

Our Supreme Court has emphasized that in order to qualify as a *Kelsey S.* father, a man must demonstrate " 'a willingness himself to assume full custody of the child—not merely to block the adoption by others.' [Citation.]" (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849, fn. omitted.) Appellant has made no such showing. Accordingly, we find ourselves in the same position as the court in *In re Sarah C.* (1992) 8 Cal.App.4th 964: "[B]ecause the facts show Paul was merely a biological father who had demonstrated no willingness to accept full parental responsibilities for Sarah the court was not required to make a particularized finding Paul was 'unfit,' and was entitled to focus on Sarah's best interests in deciding to not offer reunification services and terminate Paul's parental rights so Sarah could be adopted." (*Id.* at p. 981.)

### B. Exclusion of Evidence

Appellant cites as reversible error the court's exclusion of police reports involving the domestic violence perpetrated by appellant against mother when she was in the last trimester of her pregnancy. These police reports—which contained appellant's name, telephone number, and address as well as mother's statement naming appellant as the father of her unborn child—were incorporated by reference into the Agency's detention report back in March 2011 but were never formally entered into evidence.

8

Appellant claims the court erred in excluding this evidence at his section 388 hearing, and this error requires reversal. He indicates the police reports "were highly relevant, game-changing documents" and provided a "smoking gun" indicating that appellant should have been identified by the Agency as a possible father of the minor when the minor was first detained.

The determination of whether the juvenile court erroneously excluded evidence is guided by the Evidence Code, which applies in dependency proceedings. (*In re Manolito L.* (2001) 90 Cal.App.4th 753, 760.) A finding will not be set aside or a decision reversed by reason of the erroneous exclusion of evidence, unless the error resulted in a miscarriage of justice. (Evid. Code, § 354.) A miscarriage of justice should be declared only when the reviewing court is convinced, after an examination of the entire case, that it is reasonably probable a result more favorable to the appellant would have been reached absent the error. (*In re Marriage of Smith* (1978) 79 Cal.App.3d 725, 751.)

Even if the court's exclusion of this evidence was error, we disagree that reversal is required because appellant has failed to show any miscarriage of justice occurred here. While appellant is quick to lay blame upon the Agency for its "dilatory malfeasance" in not acting sooner based upon the information found in the police reports, the critical fact remains that appellant's opportunity to assert his interest in parenting the minor slipped away before the Agency and the juvenile became involved. As already noted, appellant admits he suspected his sexual relationship with mother had resulted in her pregnancy. Although appellant knew mother was pregnant and he potentially was the father, he failed to promptly acknowledge paternity, nor did he attempt to assume parental responsibilities as fully as his circumstances would allow. (*In re Julia U.* (1998) 64 Cal.App.4th 532, 541.)

Furthermore, although the notice appellant received of the juvenile dependency proceeding might have been belated, it still gave him sufficient time (10 months) to assert his legal rights as a natural father and to establish a father-daughter relationship, if he was disposed to do so. However, he failed to take any affirmative steps to participate in these

9

proceedings, or to develop any type of parental relationship with the minor, visiting her only once. He is in no position to care for minor himself and has only stated that he does not wish minor to be adopted by her foster parents, with whom minor has lived her entire life and who are the only parents she has ever known. Under these circumstances, *even if* the police reports established the Agency could have identified appellant as an alleged father earlier in these proceedings, such evidence would have been of only marginal value. Therefore, no miscarriage of justice occurred.

### C. Placement with Paternal Relatives

As his final argument, appellant contends, "[p]ursuant to section 361.3, the juvenile court should have placed [minor] with the paternal relatives."[5] The Agency responds that appellant does not have standing to raise this issue. We agree.

Whether a person has standing to raise a particular issue on appeal depends upon whether the person's rights were injuriously affected by the judgment or order appealed from. (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1034 (*Cesar V.*).) A person does not have standing to urge errors on appeal that only affect the interests of others. (*In re Gary P.* (1995) 40 Cal.App.4th 875, 877.) Thus, "a parent is precluded from raising issues on appeal which did not affect his or her own rights. [Citations.]" (*In re Jasmine J.* (1996) 46 Cal.App.4th 1802, 1806.)

In dependency proceedings, "preferential consideration" is required to be given to a request for placement of a dependent child with a relative. (§ 361.3, subd. (a).) Thus, it has been said that section 361.3 protects a relative's "separate interest" in a relationship with the child. (*Cesar V.*, *supra*, 91 Cal.App.4th at pp. 1034-1035.) In contrast, a parent's interest in a dependency proceeding is in reunifying with the child. (*Id.* at p. 1035; *In re Vanessa Z.* (1994) 23 Cal.App.4th 258, 261.) This parental interest in reunification is to be distinguished from a relative's "separate interest" in preferential

---

[5] The record indicates appellant's relatives were aware there were dependency proceedings regarding the minor and they visited with her on several occasions. Furthermore, the paternal grandmother obtained an approved home study from the social services agency in Illinois.

placement consideration or in having a relationship with the child. (*Cesar V.*, at pp. 1034-1035; accord, *In re Frank L.* (2000) 81 Cal.App.4th 700, 703.)

In view of this distinction, the court in *Cesar V.* held that a parent does not have standing to raise relative placement issues on appeal where the parent's reunification services have been terminated. (*Cesar V.*, *supra*, 91 Cal.App.4th at p. 1035.) This is because decisions concerning placement of the child do not affect the parent's interest in reunification where the parent is no longer able to reunify with the child. (*Id.* at pp. 1034-1035.) In contrast, where the parent's reunification services have not been terminated, placement of the child with a relative arguably affects the parent's chances of reunifying with the child. Thus, where reunification remains a possibility, the parent has standing to raise relative placement issues on appeal. (*Id.* at p. 1035, citing *In re Daniel D.* (1994) 24 Cal.App.4th 1823, 1835-1836 [mother lacked standing to challenge court's refusal to grant grandmother de facto parent status].)

Here, appellant was denied reunification services at the hearing on his section 388 petition— a ruling we have upheld on appeal. In addition, none of his relatives have filed an appeal asserting their interest in having minor placed with them. Thus, appellant lacks standing to contest the court's failure to place minor with his relatives.

### D. Mother's Appeal

In light of our conclusion that the order terminating father's parental rights must be affirmed, we need not address mother's appeal arguing that "if this Court reinstates [father's] parental rights, [mother's] parental rights must be reinstated as well."

## IV.

## DISPOSITION

The juvenile court orders terminating parental rights and denying appellant's section 388 petition are affirmed.

_____
RUVOLO, P. J.

We concur:


_____
REARDON, J.


_____
HUMES, J.