[No. G028726. Fourth Dist., Div. Three. Aug. 23, 2001.]

CESAR V. et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ORANGE COUNTY SOCIAL SERVICES AGENCY et al., Real Parties
in Interest.

**COUNSEL**

Carl C. Holmes, Public Defender, James Steinberg, Assistant Public Defender, Marri Derby and Paul T. DeQuattro, Deputy Public Defenders, for Petitioner Cesar V.

Rich Pfeiffer for Petitioner Elvia E.

Sylvia L. Paoli for Petitioner Samantha M.

Laurence M. Watson, County Counsel, and Deborah M. Gmeiner, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Harold LaFlamme and Craig E. Arthur for Minor Anthony V.

Lawrence A. Aufill for Minor Annissa V.

**OPINION**

**SILLS, P. J.**—Cesar V., biological and presumed father of Anthony and presumed father of Annissa, and Cesar's mother, Elvia E., seek extraordinary relief from the order of the juvenile court refusing to place the children with Elvia. They claim the social worker failed to assess Elvia properly under the relative placement preference, and the juvenile court should have independently evaluated her as a placement resource rather than merely reviewing the decision of the Orange County Social Services Agency (SSA) for an abuse of discretion. We grant the petition.

### I. *Facts*

In September 1999, Annissa and Anthony were declared dependents of the juvenile court. The children, then two and three years of age, had been detained after their mother was arrested. Cesar was unable to take care of the children because he was about to enter a court-ordered residential drug

treatment program; Annissa's biological father was nowhere to be found. After dispositional orders were entered, the court granted Cesar de facto parent status as to Annissa because, although he was not her biological father, he was present at her birth, his name was on her birth certificate, and he had always cared for her and held her out as his own child. The children were placed together in a foster home.

At the six-month review hearing for Annissa, reunification services were terminated and a permanency hearing was set for July 2000. At Anthony's six-month review, however, further reunification services were offered to the parents. By July, Cesar was requesting reunification services for Annissa because he planned to adopt her after he reunified with Anthony. The court continued Annissa's permanency hearing, and Cesar filed a paternity petition, seeking presumed father status.

In August, the court found Cesar to be Annissa's presumed father.[1] It vacated Annissa's permanency hearing and set a 12-month review hearing for both children a week later. By then, however, Cesar had been arrested on charges of burglary, petty theft and probation violation. According to his counsel, "he was resigned to losing his parental rights because of his being incarcerated. [¶] However, he was adamant that he wanted the children placed with his mother . . . ." He was transported in custody and stipulated to the termination of reunification services for both children.

The children's foster family was not interested in adoption, necessitating a change in placement; all parties stipulated to a placement evaluation of Elvia. The court set a permanency hearing for both children in January 2001 and ordered "SSA to evaluate paternal grandmother and paternal uncle for possible placement and any other suitable relative."

In the report filed on December 22, 2000, for the permanency hearing, the social worker reported the children had been placed in a prospective adoptive home on November 21, 2000. The social worker stated that "Elvia . . . was found not to be a suitable placement due to having a CAR [child abuse registry] history dated March 25, 1996 for allegations of physical abuse [against her son, Cesar] that were unsubstantiated due to an alternative plausible explanation. . . . The undersigned reviewed this Child Abuse Report with her supervisor and decided that this would not be a stable and safe environment for the children based on what was included in the

---

[1]There is a pending appeal by SSA from this order.

report."[2] The social worker was also concerned that the grandmother had not been in contact with social services or the children during the dependency proceedings and that she had not followed up with paperwork necessary to have the children placed with her. The social worker met with Elvia on September 18, 2000, and "requested documentation from her boyfriend she lives with to do a background check as well as a household budget and proof of income to financially provide for the children[,] which was never given to the undersigned." Elvia told the social worker she was moving and would call to give social services her new telephone number so the new home could be evaluated. The social worker stated there was no word from Elvia until December 4. "The undersigned went ahead to place these children in a stable fos-adopt home in order to not further delay providing a possible permanent home for these children."

When the court convened for the permanency hearing on January 3, 2001, Cesar's counsel challenged SSA's denial of placement with Elvia. After discussions on and off the record, the parties stipulated to proceed "in a bifurcated fashion . . ." and resolve Cesar's challenge to placement before the permanency issues. Cesar's counsel was allowed to make an oral motion that SSA abused its discretion "in the reevaluation and assessment of the grandmother pursuant to the order made on September 7th." Over the next two weeks, the court heard five days of testimony and argument on the issue.

The social worker, Julie Fulkerson, testified Elvia called her after the September 7 court hearing; Fulkerson returned the call and set up the September 18 meeting at Elvia's home. They discussed background clearance information and household budget issues, and Fulkerson explained Elvia would receive forms that needed to be filled out. The forms were sent to Elvia 10 days later by a social worker assistant. On September 26, Cesar's counsel called Fulkerson and asked her to follow up on the relative placement issue. Fulkerson called Elvia the next day reminding her to call with her new address and telephone number.

On September 29, Fulkerson received the CAR report from 1996. Although she felt the report might disqualify Elvia, she did not speak to Elvia, Cesar, or any other witnesses to the reported incidents. Fulkerson reviewed

---

[2]The social worker described the CAR report as follows: "[I]n the narrative summary it was disclosed that the minor, Cesar V. reported that he and his mother, Elvia E. constantly argue and that his mother physically abuse[d] him for years. Cesar further reported that for the past six months his mother has been hitting him with objects (i.e., phones, vases, etc.) and mother also tells him that 'she wishes that she never had him and that he is not worth a piece of shit, etc.' Cesar's mother admitted to ongoing verbal abuse and Cesar's father confirmed that there is a history of ongoing arguments between the mother and child and [the father] did not know who to believe regarding this incident."

the report with her supervisor in "maybe early October," and they determined Elvia was unsuitable based on the report "as well as over time not hearing from her, not getting other information, documentation, background information from her boyfriend, household budget. There was no response from her at all." Fulkerson later testified the "primary reason" for not placing the children with Elvia was her lack of "relationship with the children throughout dependency proceedings." Elvia called Fulkerson on December 4, and Fulkerson returned the call on December 16, informing Elvia that the children had been placed elsewhere.

Fulkerson denied receiving calls from Cesar's counsel or an SSA court officer in October 2000. She acknowledged receiving a telephone message from Cesar's counsel on November 27, 2000, asking about progress on placing the children with Elvia, but instead of returning the call, Fulkerson called the deputy county counsel on the case and asked her "to direct information to [Cesar's counsel] with regard to the placement issues." Both Cesar's counsel and the SSA court officer called Fulkerson on December 4 asking about placement; both calls were referred to county counsel. Fulkerson testified she had talked to her supervisor about the case and "he told me it's standard protocol to go ahead and call your county counsel and direct it that way." The court sustained relevancy objections to Cesar's counsel's questions about the "protocol" of social workers refusing to speak directly to other parties' counsel.

The children's prospective adoptive family first saw pictures of the children on September 27, 2000, at a family night sponsored by SSA. The children met the family on November 15 and were placed with them a week later. Fulkerson testified the family had the resources necessary to meet the children's special education needs. "These foster parents had a lot of background information, with their own son needing the specific education needs." She also considered that "the foster mother is an at-home foster mother and she's readily available to meet the needs of the two children in the home." Cesar's counsel objected to Fulkerson's testimony as irrelevant. "This is not relating to the fos/adopt parents. It's regarding the appropriateness of analyzing the placement of the grandmother. This is not a who's better test." The court overruled the objection, stating that the relative placement preference statute did not apply after the termination of reunification services "[a]nd in addition, in this instance we are looking at abuse of discretion with respect to placement issues. And certainly one aspect of abuse of discretion is a consideration that was given to the needs of the child and the needs that these prospective adoptive parents could meet."

Elvia testified she had almost daily contact with the children before the dependency proceedings were initiated and she saw the children during the

first part of the dependency when Cesar was allowed unmonitored visits. She did not ask for visits for herself because she thought she was not entitled and she thought Cesar would reunify with them. When Fulkerson met with Elvia in September, "she asked me questions about my income, and how I would provide for the kids. And then she asked me about my boyfriend's income. And I told her I did not have that information at that time." Fulkerson told Elvia she would send some paperwork, but Elvia claimed it never arrived. She testified she made several calls to Fulkerson between September 18 and December 4, but the calls were not returned. She had planned to move into a house she was purchasing in November, but the escrow fell through. She ultimately moved in December into another house she is purchasing.

The juvenile court found SSA acted upon its order to assess Elvia as a placement resource. It determined that Welfare and Institutions Code section 361.3[3] applied and that the question before it was whether SSA abused its discretion under the statute. Given the information available to SSA, which the court found was "credible to the point it was not unreasonable for the Agency to act on it," balanced against Elvia's conduct, the court found SSA did not abuse its discretion in denying placement.

Cesar's counsel then filed a section 388 petition alleging new evidence showing Elvia's suitability as a placement for the children. The petition incorporated offers of proof from an independent clinical social worker and Elvia's former landlady which confirmed Elvia's good moral character and her parenting abilities, and provided an assessment of her new home. The court denied a hearing on the petition, finding it did not make a prima facie showing of how the relief sought would be in the best interests of the children.

## II. *Relative Placement Preference*

Cesar and Elvia first contend SSA never completed the relative placement evaluation it was ordered to perform at the 12-month review hearing on September 7. They are joined in this contention by counsel for both Anthony and Annissa, who urged at oral argument before this court that Elvia's evaluation should be completed. Cesar and Elvia also contend even if the evaluation were complete, the juvenile court used the wrong standard in reviewing SSA's refusal to place the children with Elvia. They claim under

---

[3]All statutory references are to the Welfare and Institutions Code unless otherwise specified.

section 361.3,[4] the court should have used its independent judgment to evaluate the grandmother rather than merely reviewing SSA's actions for an abuse of discretion. SSA, on the other hand, contends section 361.3 was not applicable because reunification services had been terminated, but that in any event, the juvenile court correctly evaluated SSA's decisions under the abuse of discretion standard.

### A. *Section 361.3 applies before parental rights are terminated.*

■ It is well established that the relative placement preference found in section 361.3 does not apply after parental rights have been terminated and the child has been freed for adoption. In *In re Sarah S.* (1996) 43 Cal.App.4th 274 [50 Cal.Rptr.2d 503], the court compared that statute to section 366.26, subdivision (k), which provides that a relative caretaker or

---

[4]Section 361.3 provides in part: "(a) In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative. In *determining whether placement with a relative is appropriate, the county social worker and court shall consider, but shall not be limited to, consideration of all the following factors:* [¶] (1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs. [¶] (2) The wishes of the parent, the relative, and child, if appropriate. [¶] (3) The provisions of Part 6 (commencing with Section 7950) of Division 12 of the Family Code regarding relative placement. [¶] (4) Placement of siblings and half-siblings in the same home, if that placement is found to be in the best interest of each of the children as provided in Section 16002. [¶] (5) The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect. [¶] (6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for the child. [¶] (7) The ability of the relative to do the following: [¶] (A) Provide a safe, secure, and stable environment for the child. [¶] (B) Exercise proper and effective care and control of the child. [¶] (C) Provide a home and the necessities of life for the child. [¶] (D) Protect the child from his or her parents. [¶] (E) Facilitate court-ordered reunification efforts with the parents. [¶] (F) Facilitate visitation with the child's other relatives. [¶] (G) Facilitate implementation of all elements of the case plan. [¶] (H) Provide legal permanence for the child if reunification fails. [¶] However, any finding made with respect to the factor considered pursuant to this subparagraph and pursuant to subparagraph (G) shall not be the sole basis for precluding preferential placement with a relative. [¶] (I) Arrange for appropriate and safe child care, as necessary. [¶] . . . [¶]

"(c) For purposes of this section: [¶] (1) 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated. . . . [¶] . . . [¶]

"(d) Subsequent to the [dispositional hearing], whenever a new placement of the child must be made, consideration for placement shall again be given as described in this section to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements. In addition to the factors described in subdivision (a), the county social worker shall consider whether the relative has established and maintained a relationship with the child.

"(e) If the court does not place the child with a relative who has been considered for placement pursuant to this section, the court shall state for the record the reasons placement with that relative was denied."

foster parent of a dependent child shall be given preference in applying to adopt the child. "[S]ection 361.3 assures interested relatives that, when a child is taken from her parents and placed outside the home pending the determination whether reunification is possible, the relative's application will be considered before a stranger's application. . . . When reunification fails, section 366.26, subdivision (k), assures a 'relative caretaker' who has cared for the child that, when parental rights are terminated and the child is freed for adoption, his or her application will be considered before those submitted by other relatives and strangers." (*In re Sarah S., supra*, 43 Cal.App.4th at p. 285; see also *In re Baby Girl D.* (1989) 208 Cal.App.3d 1489, 1493 [257 Cal.Rptr. 1].)

■ Here, the question is whether the relative placement preference applies when a new placement becomes necessary after reunification services are terminated but before parental rights are terminated and adoptive placement becomes an issue. Citing language from several cases, SSA urges the underlying purpose of the relative placement preference is to facilitate reunification, and that purpose no longer obtains once reunification services are terminated. "[T]he 'object of dispositional hearings is to find a temporary caretaker who will meet the child's physical and psychological needs while cooperating in reunification efforts. A relative, who presumably has a broader interest in family unity, is more likely than a stranger to be supportive of the parent-child relationship and less likely to develop a conflicting emotional bond with the child.' [Citation.] When a case moves from reunification to permanency planning, however, and a court determines that a child should be freed for adoption, we held there is 'no longer any reason to give relatives preferential consideration in placement.' " *(In re Jessica Z.* (1990) 225 Cal.App.3d 1089, 1098 [275 Cal.Rptr. 323], quoting *In re Baby Girl D., supra,* 208 Cal.App.3d at p. 1493; see also *In re Robert L.* (1993) 21 Cal.App.4th 1057 [24 Cal.Rptr.2d 654].)

These cases, however, were decided under a previous version of section 361.3. In 1993, the statute was amended to include subdivision (d), which specifically provides for the application of the relative placement preference if a child must be moved after disposition, "to relatives who have not been found to be unsuitable and who will fulfill the child's reunification *or permanent plan* requirements." (§ 361.3, subd. (d), italics added.) In 1997, the statute was again amended to add the ability of the relative to "[p]rovide *legal permanence for the child if reunification fails*" to the list of factors that must be considered when evaluating a relative for placement. (§ 361.3, subd. (a)(7)(H), italics added.) These additions to the statute indicate the Legislature did not intend to limit the purpose of the relative placement preference to reunification efforts.

B. *SSA's evaluation of Elvia was not sufficient under section 361.3.*

Section 361.3 gives "preferential consideration" to a relative request for placement, which means "that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) The assessment of the relative shall involve the consideration of eight factors set out in the statute, including "[t]he good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect"; and "[t]he safety of the relative's home. For purposes of this paragraph, the county social worker shall conduct a direct assessment of the safety of the relative's home. The information obtained as a result of this assessment shall be documented by the county social worker in the child's case record." (§ 361.3, subd. (a)(5) & (8).) The statute reiterates: "The county social worker shall document these efforts [to assess the relative according to the statutory factors] in the social study prepared pursuant to Section 358.1." (§ 361.3, subd. (a)(8).)

■ The record shows the social worker did not make significant efforts to gather the required information before deciding Elvia was unsuitable and abandoning the assessment. Furthermore, the social worker began looking for another foster family before Elvia had even received SSA's forms. This approach is clearly not within the spirit of the statute. While we understand the urgency involved in securing a stable placement for dependent children, SSA is required to give a fair chance to a relative seeking placement. The correct application of the relative placement preference places the relative "at the head of the line when the court is determining which placement is in the child's best interests." *(In re Sarah S., supra,* 43 Cal.App.4th at p. 286.)

C. *Section 361.3 requires the juvenile court's independent judgment.*

■ When section 361.3 applies to a relative placement request, the juvenile court must exercise its independent judgment rather than merely review SSA's placement decision for an abuse of discretion. The statute itself directs both the "county social worker and court" to consider the propriety of relative placement. (§ 361.3, subd. (a).) The cases, too, discuss the relative placement preference in the context of an independent determination by the juvenile court. "[T]he statute expresse[s] a command that relatives be assessed and considered favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child." *(In re Stephanie M.* (1994) 7 Cal.4th 295, 320 [27 Cal.Rptr.2d 595, 867 P.2d 706], italics omitted.)

The confusion apparently arose from the juvenile court's misapprehension that its role was controlled by *Department of Social Services v. Superior*

*Court* (1997) 58 Cal.App.4th 721 [68 Cal.Rptr.2d 239]. There, the court held the Legislature has given the social services agency the exclusive care, custody and control of minors referred for adoptive placement following the termination of parental rights. Thus, the juvenile court has no power to use its independent judgment to change the placement decision of the social services agency for a child that had been freed for adoption, but can review its decision only for an abuse of discretion. "Absent a showing that DSS's placement decision is patently absurd or unquestionably not in the minor's best interests, the juvenile court may not interfere and disapprove of the minor's placement, thereby requiring that the minor be relocated to another home." (*Id.* at p. 734; see also *Los Angeles County Department of Children and Family Services v. Superior Court* (1998) 62 Cal.App.4th 1 [72 Cal.Rptr.2d 369].)

These cases concerned children who had been referred for adoptive placement after the termination of parental rights and were based squarely on statute. (See § 366.26, subd. (j); Fam. Code, § 8704.) The case before us, however, involves the relative roles of SSA and the juvenile court *before* parental rights are terminated. Notwithstanding the termination of reunification services here, parental rights are still intact and the children have not yet been referred to SSA for adoptive placement. Under these circumstances, the juvenile court has the power and the duty to make an independent placement decision under section 361.3.[5]

### III. *Standing*

 SSA contends neither Cesar nor Elvia has standing to appeal the relative placement preference issue. It argues Cesar is not legally aggrieved by the order denying placement because the only interest affected is Elvia's interest in preserving her relationship with the children. But it then claims Elvia cannot challenge that order because she is not a party.

Elvia, although not a party, has standing to seek appellate review of the denial of her request for placement under section 361.3. "[W]hether one has standing in a particular case generally revolves around the question whether that person has rights that may suffer some injury, actual or threatened." (*Clifford S. v. Superior Court* (1995) 38 Cal.App.4th 747, 751 [45 Cal.Rptr.2d 333].) Elvia's separate interest in her relationship with

---

[5]Cesar and Elvia argue the juvenile court should have allowed Cesar's counsel to question Fulkerson about SSA's protocol of directing questions from other parties to county counsel, claiming Cesar was attempting to show the social worker's bias. Although we are troubled about the implications of such a protocol, if it exists, our determination that a new hearing is necessary eliminates its relevance to this case.

Anthony, her grandson, is legally protected in section 361.3, which confers upon a grandparent the right to preferential consideration for placement. "[A]ny person having an interest recognized by law in the subject matter of the judgment, which interest is injuriously affected by the judgment" is considered a "party aggrieved" for purposes of appellate standing. (*In re Joel H.* (1993) 19 Cal.App.4th 1185, 1196 [23 Cal.Rptr.2d 878].)

We agree with SSA that Cesar has no standing to appeal the relative placement preference issue. Especially in light of his stipulation to terminate reunification services, we cannot see how the denial of placement with Elvia affects his interest in reunification with the children. It does not preclude Cesar from presenting any evidence about the children's best interests or their relationship with him. (See *In re Vanessa Z.* (1994) 23 Cal.App.4th 258, 261 [28 Cal.Rptr.2d 313]; cf. *In re Daniel D., supra,* 24 Cal.App.4th at pp. 1833-1834 [although challenge was untimely, mother apparently had standing to raise denial of relative placement preference before termination of reunification services where such placement arguably would have affected the mother's chances at reunification].)[6] "An appellant cannot urge errors which affect only another party who does not appeal." (*In re Vanessa Z., supra,* 23 Cal.App.4th at p. 261; *In re Sarah M.* (1991) 233 Cal.App.3d 1486, 1503 [285 Cal.Rptr. 374].) But Elvia has properly placed the issue before us, and Cesar has formally joined in her arguments; furthermore, by stipulation of the parties and with the juvenile court's acquiescence, Cesar extensively litigated the issue below. Under these circumstances, Cesar will be permitted to support Elvia's position with arguments of his own. (See *In re Sarah S., supra,* 43 Cal.App.4th at p. 282, fn. 10.)

### IV. *Denial of Cesar's section 388 petition*

Cesar and Elvia's final contention is that the juvenile court erroneously refused to grant a hearing on Cesar's petition under section 388 because there was no prima facie case of changed circumstances. They claim a showing of new evidence is enough to trigger the right to a hearing. The statute requires either new evidence or changed circumstances, but

---

[6]We note the cases cited in support of SSA's contention that Cesar lacks standing are factually inapt. *In re Gary P.* (1995) 40 Cal.App.4th 875 [46 Cal.Rptr.2d 929] and *In re Nachelle S.* (1996) 41 Cal.App.4th 1557 [49 Cal.Rptr.2d 200] involved challenges to visitation orders made in conjunction with appeals from the termination of parental rights. (See also *In re Jasmine J.* (1996) 46 Cal.App.4th 1802 [54 Cal.Rptr.2d 560].) In *In re Devin M.* (1997) 58 Cal.App.4th 1538 [68 Cal.Rptr.2d 666], the mother challenged an order severing her child's relationship with his foster family. The child had been placed in long-term foster care, and although the mother's parental rights had not been terminated, the case had gone beyond the permanent planning stage. And *In re Carissa G.* (1999) 76 Cal.App.4th 731 [90 Cal.Rptr.2d 561] concerned the mother's standing to appeal the juvenile court's dismissal of a dependency petition for insufficient evidence of jurisdiction.

neither of these is sufficient to obtain a hearing without a prima facie showing that "the best interests of the child may be promoted by the proposed change of order. . . ." (§ 388.) Because we have determined that there must be a new hearing on the relative placement preference issue, however, the claim of error on the section 388 petition is moot.

## V. *Disposition*

Let a writ of mandate issue directing the juvenile court to reverse its order finding no abuse of discretion by SSA and denying placement with Elvia and enter a new order directing SSA to complete its assessment of Elvia as required by section 361.3. After the assessment is complete, the juvenile court shall hold a new hearing where it will exercise its independent judgment on the suitability of placing the children with Elvia. The stay of the permanency hearing, previously scheduled for March 13, 2001, will remain in force and effect until the relative placement issue is heard and resolved.[7]

Rylaarsdam, J., and Crosby, J.,* concurred.

A petition for a rehearing was denied September 18, 2001.

---

[7]Anthony's counsel tells us that in mid-April, the children were removed from their "fos-adopt" home and returned to Orangewood. SSA is looking for another home and refuses to consider Elvia.

*Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.