Filed 6/3/21  In re Matthew C. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| In re MATTHEW C., a Person Coming Under the Juvenile Court Law. | C092560 |
| NEVADA COUNTY DEPARTMENT OF SOCIAL SERVICES, | (Super. Ct. No. J09519) |
| Plaintiff and Respondent, | |
| v. | |
| K.C., | |
| Defendant and Appellant. | |

K.C., mother of the minor (mother), appeals from the juvenile court's orders terminating parental rights and freeing the minor for adoption.  (Welf. & Inst. Code, §§ 366.26, 395; further unspecified statutory references are to this code.)  We will affirm the juvenile court's orders.

1

FACTS AND HISTORY OF THE PROCEEDINGS

The minor was born in June 2011.

The minor came to the attention of the Nevada County Department of Social Services (Department) in September 2018 when law enforcement arrested mother, who was under the influence of a controlled substance and in possession of heroin and drug paraphernalia while the minor was in her care. The minor was detained and placed in a foster home. He later informed the social worker that he was worried mother would get hurt because she had fallen in the past and "a needle got stuck in her head." He was also worried mother would not get out of jail stating, "My mom is in jail, my brother is in jail, my sister is in jail, and my dad is in jail." The minor revealed that he had, in the past, found needles in the house and outside in the parking lot, one with mother's name on it. He stated mother put "poison" in the needles as he demonstrated the motion of injecting a needle.

The social worker spoke on the telephone with the minor's adult sister, Ashley, who stated that mother had been injecting methamphetamine for a long time and had recently started "shooting up in her neck and other areas," and was also abusing prescription pain medication. Ashley stated she had observed burnt residue on different items in the home and she believed mother might also be using heroin. Ashley stated mother had a boyfriend who was a registered sex offender and that she was "shooting up methamphetamine with a new guy over at the house every other day." She stated there were drug deals in mother's home and that mother "wants to get high first" before preparing the minor for school.

The social worker also spoke with mother, who denied using heroin but admitted using methamphetamine. Mother claimed Ashley was using drugs and stated mother was triggered when Ashley would come to the home. Mother claimed Ashley was a negative

influence on both mother and the minor and stated that Ashley would tell the minor that mother injected methamphetamine and loved drugs more than him.

The Department filed a dependency petition on behalf of the seven-year-old minor pursuant to section 300, subdivisions (b) and (g). The petition alleged mother's failure to protect the minor due to the incident leading to her arrest as well as six substantiated child welfare investigations involving mother's absence and general neglect of her adult children since 2005. The petition also alleged failure to provide support due to mother's detention.

On September 24, 2018, the court ordered the minor detained, appointed a special advocate for the minor (CASA), and ordered supervised visitation and reunification services for mother, including alcohol and drug testing, substance abuse treatment, and parenting education. At the detention hearing, mother was asked if there were any family members who should be considered for placement. Mother provided the name of a family friend, Jody, and stated there was no other relative to be considered. Mother also requested that the court not allow Ashley to visit with the minor, stating she was concerned about Ashley's substance abuse. The court stated it was not entering an order for visitation and directed the Department to maintain any sibling relationships if it could be done in a healthy environment where the minor would not be exposed to any risk of danger.

The October 2018 addendum report stated mother failed to attend the minor's individualized educational plan (IEP) meeting and psychiatrist appointments and was inconsistent with visitation, causing the minor to become sad and upset. As of October 16, 2018, mother had not engaged in drug screening, an alcohol and drug assessment, or a parenting program. The report detailed mother's extensive history of child protective services (CPS) referrals beginning in 1998, noting mother had struggled with substance abuse, maintaining appropriate housing, and providing adequately for her children. The report also noted the minor's father had also struggled with sobriety and

3

had been in prison most of the minor's life. The father was currently incarcerated until November 2020. The minor reportedly missed his mother but was "doing okay" in placement. The minor also worried for his mother's physical and mental health.

The court sustained the allegations in the petition and adjudged the minor a dependent of the juvenile court on October 18, 2018.

The November 2018 disposition report stated mother had yet to begin a parenting program but was scheduled for an intake appointment. Mother entered an in-patient residential drug treatment program on November 1, 2018 and was fully engaged in those services. She began random drug testing at that time, testing positive for methamphetamine. She tested clean nine days later. Since entering treatment, mother's visits with the minor were consistent. The minor was placed in a foster home and adjusting well to placement with no concerning behaviors. Since placement, his aggression and acting out in school had decreased. However, he had a hard time leaving his mother after visits and became very sad when she did not attend. The report noted there had been no relatives identified for possible placement of the minor. It was also noted that visitation with siblings, including Ashley, had not been arranged "due to the instability of the siblings' lives and their current substance abuse."

At the November 15, 2018 disposition hearing, the court ordered continued out-of-home placement for the minor and reunification services and visitation for mother.

The Department reported that, while, mother was subject to bypass under section 361.5, subdivision (b), it would nonetheless be in the minor's best interest to offer mother reunification services pursuant to section 361.5, subdivision (c).

According to a CASA report filed May 10, 2019, the minor lived in his first foster home from September 2018 to February 2019, when the foster caregivers gave a 7-day notice due to an incident in which the minor threw objects at a much younger and smaller foster sister. The foster parents claimed mother was influencing the minor's behavior and reported that they noticed increased behavioral issues at home and in school around the

4

time the minor began unsupervised visits with mother. The minor was then placed in his second foster home on February 28, 2019 but, after a "rapid deterioration of behavior" occurred, the foster caregivers gave a 7-day notice, reporting they too believed mother was "coaching" the minor in his negative behavior and had instructed the minor to take a specific item from their home and bring it to her to use in an unfounded complaint against them. The second foster caregivers eventually withdrew their 7-day notice. The CASA noted that mother disliked the foster caretakers and wanted the minor "out of that home." The minor's anxiety about his placement situation decreased considerably when mother's phone contact was restricted.

The CASA reported the minor had had a few approved visits with his sister Ashley and possibly several unapproved visits while in mother's care. It was noted that, since the minor's detention, Ashley had entered and voluntarily left drug treatment. Mother reportedly had unapproved persons come to the hotel where she was living, and had stayed at an unapproved location with unapproved persons without the Department's knowledge. Mother also had an argument with Ashley while at the hotel, an event which caused the minor to be extremely upset and to act out the following day at school and in his placement. As a result, mother's regular unsupervised visits were suspended.

The May 2019 status review report stated mother was struggling to attend and participate in services and demonstrate the minor was a priority. The minor worried about mother's choices and whether she would ever be able to care for him. When mother failed to follow through with the minor's medical appointments, the minor became extremely upset and demonstrated challenging behaviors at school the following day. Mother's progress in her services was, for the most part, minimal. She was consistent with random drug testing twice weekly between November 2018 and April 2019, with negative results, but had several recent missed tests. She was also discharged from transitional living. Mother violated overnight visitation rules by involving other unapproved people in the visits without the Department's knowledge. After one incident

in April 2019, school staff reported that mother appeared "high" when she dropped off the minor, who thereafter had a difficult day in school, was out of the classroom, refused to eat, and vomited most of the day. When the minor was told there would be no more weekend visits, the minor became very upset. He made it clear that he wanted to stay in his current placement.

A subsequent addendum report stated the minor displayed impulsive and angry behaviors including grabbing things, clearing tables in anger, vocal interruptions, acting like a cat, pounding on walls and tables, leaving class to hide under bushes, throwing things, eloping, destroying property, and being defiant. Due to the severity of the minor's behaviors, an emergent IEP meeting was scheduled, but mother failed to attend and thereafter failed to attend a subsequent make-up meeting. Mother's failure to attend meetings resulted in the minor exhibiting increased aggressive behaviors. When mother visited with the minor after school, the school staff noted a "dramatic increase in negative behaviors" by the minor the following day. The minor's special education teacher reported that the minor stated his behaviors were worse after seeing his mother because he did not want to be adopted and he was afraid she would do drugs again. He felt it was his responsibility to make sure mother stayed healthy.

At the six-month review hearing on May 30, 2019, the court noted mother's progress in her case plan was minimal but continued services for another six months. The court also designated the CASA as the minor's educational rights holder and ordered conjoint therapy for mother and the minor and supervised visitation.

Mother was reportedly arrested on August 7, 2019 after she and another individual who was on probation were located in the bathroom of a business and were found to be in possession of a knife and drug paraphernalia. She was making minimal to no progress in her case plan and had tested positive for methamphetamine as recently as July 5, 2019, followed by no testing in August 2019 and failure to test six times in September 2019. The Department expressed concerns about mother's recent arrest, her struggles with and

6

lack of engagement in services, and several missed drug tests and positive tests for methamphetamine. On the other hand, the minor was making "excellent progress towards his treatment goals," had begun to regulate his emotions and move past his constant worry about mother, and was asking about a forever home. The minor's current foster family was unable to offer permanency, so the Department was continuing its search for a permanent placement. He was doing much better in school and was becoming healthier, and he looked forward to visits with Ashley.

Mother's visitation was sporadic. The minor expressed anger at mother for not always showing up to visits and not completing her substance abuse treatment services by being defiant and not following her directions. He reportedly returned from visits not wanting to talk. The minor had unsupervised visitation with Ashley once a week, which he enjoyed. They watched movies, ate, and walked together downtown, and the minor hugged Ashley at the end of the visit. He returned from visits with Ashley happy and talkative about the visit.

The Department noted mother had not regularly participated or made substantive progress in her court-ordered treatment plan and was only marginally engaged in reunification services. Given the lack of sufficient progress, along with the multiple methamphetamine-positive and missed drug tests, the Department recommended the court terminate mother's services and set the matter for a section 366.26 hearing.

The October 2019 CASA report stated the minor had been in one foster home and two short-term respite foster homes prior to his current placement, where his caregivers declined to be a permanent placement primarily due to his age. The minor was doing much better in school with little or no severe behavioral issues. The minor's visitation with mother was very difficult. Since the six-month review hearing, mother's attendance at scheduled supervised visits began to deteriorate significantly, leading to disappointment and frustration for the minor. Twice-weekly visits were not well attended by mother from July to September 2019. On the other hand, the minor enjoyed

supervised and unsupervised visits with Ashley, who was an important person to him. However, Ashley had a history of engaging in verbal disputes with mother in the minor's presence. She had entered and voluntarily left drug treatment early in the case but was re-enrolled and living at a drug and alcohol rehabilitation center (CoRR). Since the six-month review hearing, Ashley had actively and consistently pursued a relationship with the minor, which the CASA observed to be positive and beneficial for the minor.

At the contested 12-month review hearing on October 31, 2019, the court terminated mother's reunification services, set the matter for a section 366.26 hearing, and ordered twice-monthly supervised visits for mother and unsupervised visits for Ashley.

On February 4, 2020, the court granted the request for appointment of an expert to conduct a bonding study between the minor and Ashley.

The section 366.26 report stated mother was arrested on January 8, 2020 after officers found in her possession of four envelopes and a health insurance card that did not belong to her. Mother also had two pending criminal charges (possession of a controlled substance and ingestion device and hit and run). She required repeated redirection during visits because she continued to discuss inappropriate things with and make inappropriate promises to the minor. On January 5, 2020, the social worker witnessed mother whisper to the minor at the end of a supervised visit and then quickly and "slyly" make the minor sign a piece of paper. On January 24, 2020, the minor reported that mother told him to tell his attorney he wanted to live with Ashley and did not want to be adopted.

The Department assessed the minor to be adoptable, noting he was a young, healthy child who wished to have a family care for him and "be his parents." The minor reported he loved his own parents, but he worried about his mother who continued to "do drugs." The Department also concluded none of the exceptions to adoption applied. The Department noted that, since January 8, 2020, it had received one request for placement by extended family members in Colorado and another request for placement by Ashley,

8

who was going through the resource family approval (RFA) process but failed to show up for a scheduled RFA orientation. The Department had concerns however due to the fact that, when the minor was born, Ashley was 15 years old, was living with the minor and mother, and was actively using illegal substances with mother. Once Ashley engaged in substance abuse treatment services, she began unsupervised visits with the minor, who felt Ashley was doing better than when they lived together with mother. However, the minor worried that Ashley would continue to follow in his mother's path of drug abuse and criminal activity. The Department recommended that the court terminate parental rights and free the minor for adoption.

The February 2020 CASA report stated the minor was in his third foster home after being removed from his second foster home on October 26, 2019 due to problems not related to him. Initially, the minor was doing well in his placement and began calling his foster parents "Mom" and "Dad" within a couple of weeks of moving into the home. However, after several months, his behavioral problems at the before- and after-school program quickly escalated and he eloped from the program on February 10, 2020. The foster parents reported that the minor became physical with his two older foster siblings, striking one in the stomach with his fist and putting his arm around the other's neck. In early-February 2020, the minor reportedly was rude and threatened himself and others in the home, resulting in the foster parents' withdrawal of their offer of permanency for the minor. Similarly, the minor's teachers reported that, since incurring another placement change in late-October 2019, the minor's behavioral issues re-emerged, which severely impacted his ability, and the ability of his peers, to learn and placed other children in danger.

The CASA agreed with the Department's recommendation to terminate parental rights and free the minor for adoption. With regard to Ashley's desire to provide permanency for the minor, the CASA shared the Department's concerns due to "the short period of time since Ashley has completed substance abuse rehabilitation as well as the

9

historical relationship/personal boundary issues with her mom." Further, Ashley was unable to drive the minor during unsupervised visits because she did not carry the required insurance. The CASA was also concerned about boundary issues between Ashley and the minor and Ashley's ability and preparedness to deal with the minor's behavioral issues.

In February 2020, the Department reported that, during a supervised visit between mother and the minor, mother had to be admonished three times for whispering to the minor and discussing court issues with him. The minor's behaviors escalated (i.e., he began growling, cursing, and kicking anything in his way) and the visit had to be terminated after mother made no attempt to de-escalate the minor. The Department recommended that visits with mother be suspended.

In his bonding study report, Kevin J. Dugan, Ph.D. assessed the nature and strength of the relationship between the minor and Ashley. Dugan interviewed Ashley and discussed concerns regarding her previous substance abuse. Ashley stated she used to abuse alcohol, methamphetamine, and opiates, but she had been clean for almost 14 months, she was a regular participant in a 12-step program, she had a sponsor, she attended meetings regularly, and she was active in the recovery community. Ashley denied any relapses or temptations to relapse over the previous 14-month period, stating she had made "pervasive" changes in her life, including not "affiliating" with people who used or abused substances. She stated she had been working as a certified nursing assistant for nearly a year and fitting in 12-step meetings every day during lunches and breaks. She was living in a one-bedroom apartment which was approved as appropriate for the minor. She reported she saw mother during her regular visits to the CoRR inpatient facility and noted mother had over 30 days of sobriety. When asked whether she would allow contact between mother and the minor, Ashley said, "Hell no – if she is still using." Ashley noted mother would need to demonstrate a lifestyle of sobriety and

10

make positive behavioral changes before Ashley would allow her to have contact with the minor.

Dugan spoke with social worker Cheryl Gonzales, who stated the minor's behavior had regressed fairly recently, noting the minor informed her that his mother and Ashley "told me that if I misbehave – I won't be with my foster parents." She stated the minor's acting out coincided with the approval of unsupervised visits with Ashley, and she expressed concern that the minor might be having access to mother during those visits although Ashley denied any such contact. Gonzales stated the minor also talked about a court date despite that neither CPS staff nor the minor's service providers had discussed court dates with the minor. With regard to Ashley's interest in being the minor's guardian, Gonzales stated that Ashley indicated in December 2018 that she was not able to care for the minor but, when the foster family stated they would not be proceeding with adoption, Ashley changed her mind and wanted to act as the minor's guardian. Gonzales expressed "notable reservations" about Ashley's request to act as guardian, including that Ashley missed her RFA orientation appointment, had demonstrated some instability in her emotions and behavior (e.g., she was "highly stressed" at one point and unable to work), there were discrepancies about not having contact with mother, and she was only one year into her sobriety. Gonzales also had concerns about the fact that the minor remembered when Ashley was engaged in polysubstance abuse as demonstrated by the fact that he asked to see Ashley's arms in an effort to assess whether Ashley had been injecting substances. Gonzales described the relationship history between Ashley and the minor as "likely not being that well-developed given Ashley was in the foster care system for quite some time, and upon her returning to the family unit, was demonstrating difficult behavior to include problematic substance abuse until just over one year ago" and the minor was removed "before Ashley started becoming clean and sober." Gonzales noted that relatives in Colorado had expressed a willingness to receive the minor and to allow Ashley to remain in his life.

11

Dugan also interviewed the minor, who was notably guarded, reserved, and somewhat unresponsive when Dugan attempted to talk with him about family relationships. The minor identified Ashley as his favorite person and stated he was happy when he was able to see her and he would want her to keep looking for him if he was lost. He declined to discuss why he was concerned about seeing Ashley's arms.

Dugan also observed a session with Ashley and the minor and found Ashley demonstrated good boundary-setting and redirection behaviors and the minor appeared to respond in a cooperative and respectful way. The two were consistently engaged and interactive and seemed to enjoy each other. Ashley consistently encouraged the minor and offered positive praise. At times, Ashley acted as an authority figure and the minor responded well. At other times, she acted as a "friendly relative." Dugan concluded that Ashley maintained regular visitation and contact with the minor and consistent authoritative parenting. Dugan opined that the minor would benefit from having an ongoing relationship with Ashley and he would be detrimentally impacted if his relationship with Ashley were terminated.

With regard to the question of whether Ashley was able to provide the minor with an ongoing stable and nurturing home and lifestyle, Dugan concluded that, on the one hand, Ashley was to be commended for maintaining her sobriety and her commitment to her recovery and for making positive changes. On the other hand, there was still some concern that Ashley occasionally felt emotionally reactive and unstable and needed "a lot of external support (sometimes multiple 12-step meetings per day)." Dugan noted that Ashley's work commitments were full-time, and it was unclear how she would provide ongoing support given the minor's school schedule.

Based on his assessment and assuming the potential adoptive/extended family in Colorado would provide a positive, nurturing, and stable environment for the minor, Dugan concluded that the minor's benefit from placement with his adoptive extended

family placement would outweigh the detriment experienced if his relationship with Ashley were terminated.

On March 5, 2020, the court ordered an Interstate Compact on the Placement of Children (ICPC) be completed for the minor's extended paternal family in Colorado.

The May 2020 addendum report stated the minor's caregivers requested a break due to the minor's escalating behaviors, including anxiousness around contact with mother or Ashley and difficulty regulating himself as demonstrated by extreme chewing on items such as the wood bedframe, the vehicle's leather upholstery, and the video game console and controllers. The minor was placed in a respite home for one week and then returned to his caregivers, who then gave a 7-day notice stating they had taken in two other foster children and needed to protect their biological children and were no longer able to provide the minor with the attention he needed. The minor was moved to the home of his new (current) caregivers on May 5, 2020.

Mother was reportedly maintaining weekly contact with the social worker, who noted that mother continued to struggle with her sobriety and boundaries with her adult children, including Ashley. Ashley was still in the process of completing her RFA approval. The Department continued to have concerns about Ashley's boundaries with mother and her brother (the minor's older brother). The minor's paternal cousins in Colorado were also still in the process of completing their ICPC licensing.

The social worker spoke with Ashley about the minor's brief period in a respite home. Ashley became upset and anxious, demanding to know details about the case. The Department had concerns about continuing visitation between Ashley and the minor, as Ashley appeared to be unable to regulate her emotions, she escalated quickly, she became unreasonable and upset when she did not get the answers she wanted, and she struggled to place the minor's well-being over her own. Ashley demanded daily contact with the minor without regard to minor's desires. Due to the fact that visits with mother and Ashley continued to cause the minor a great deal of anxiety, the Department

13

requested that the court suspend visitation until the minor could develop some degree of trust and bonding with his current caregivers. The Department reiterated its assessment that the minor was adoptable and recommended termination of parental rights, noting the minor was currently placed with caregivers and had the possibility of concurrent placement with his Colorado relatives and, in the event either of those options failed, the Department was "confident" another adoptive placement could be secured for the minor.

According to the June 2020 addendum report, the minor continued to experience anxiety regarding visits with mother, particularly when she did not show up for a video visit, and was becoming "highly irritated" with all of the video calls with mother, Ashley, the social worker, Department staff, his CASA, and service providers. It was also reported that the minor's extended family in Colorado received a call from Ashley, who appeared to be more concerned about herself than the minor's overall needs.

The section 366.26 hearing eventually commenced on June 18, 2020. After considering testimony from social worker Gonzales, mother, and CASA John Burgasser, the court found by clear and convincing evidence that the minor was adoptable "despite having some behavioral issues." The court terminated parental rights, freeing the minor for adoption.

DISCUSSION

I

*Adoptability*

Mother contends there was insufficient evidence to support the juvenile court's finding that the minor was likely to be adopted within a reasonable period of time. Her claim lacks merit.

To terminate parental rights, "the [juvenile] court must find by clear and convincing evidence that it is likely that the child will be adopted." (*In re Asia L.* (2003) 107 Cal.App.4th 498, 509; see also § 366.26, subd. (c)(1).) There must be "convincing

14

evidence of the likelihood that adoption will take place within a reasonable time." (*In re Brian P.* (2002) 99 Cal.App.4th 616, 624.) "Although a finding of adoptability must be supported by clear and convincing evidence, it [i.e., the determination that it is likely the child will be adopted within a reasonable time] is nevertheless a low threshold." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292 (*In re K.B.*).)

The issue of adoptability "focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.] Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' " (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649, italics omitted.) But, " 'the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family.' " (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154, italics omitted; accord, *In re Sarah M.*, at pp. 1649-1650.)

We review the juvenile court's finding on this issue under the substantial evidence standard, giving it the benefit of every reasonable inference and resolving any evidentiary conflicts in favor of affirming. (*In re I.I.* (2008) 168 Cal.App.4th 857, 869.) That is, we must determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child was likely to be adopted within a reasonable time. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1232.) If so, "[i]t is irrelevant that there may be evidence which would support a contrary conclusion." (*In re K.B., supra*, 173 Cal.App.4th at p. 1292.)

Here, the court found the minor was adoptable "despite having some behavioral issues" based in part on the fact that the minor was a sweet, loving, funny, and smart

15

child who loved music and loved to cuddle, sing, and play. The court also noted the minor loved sports, had a good sense of humor, and was "a giving and empathetic child." The court expressly noted that, although the minor suffered from "extreme anxiety at times" and "does have some fairly significant behavioral issues as well as some learning disabilities," those issues were mostly situational, caused in large part by the "uncertainty surrounding his future, the disruptive placements, some of which were not due to anything [the minor] did, the anxieties he feels both before and after visits, the worry he has for his mother and whether she is using drugs or is okay and the numerous court appearances that he somehow had information about."

Mother claims the court's finding of adoptability within a reasonable time was based on the social worker's unrealistic assessment of the minor that did not reflect the evidence in the record. She describes a child who was traumatized because he could not be with her and she claims none of the various placement options were feasible other than placement with Ashley. Mother argues the social worker testified about pertinent information she failed to include in her reports and mischaracterized or omitted information about the viability of placement options. The record belies mother's claims.

The social worker testified she determined the minor was adoptable based on the fact that he "is probably one of the sweetest little kids I've met. He's loving. He's – he's always wanting . . . . to make everybody happy. He always asks for cuddles. He's always asking for somebody – you know, he just wants to sit with somebody or sit near them or give them attention. He's smart. He's funny. He likes to – he loves music and loves to sing. He – he just is like this great little guy that just loves to play." She testified the minor was healthy and had no medical disabilities other than being overweight and having a "speech problem" and attention deficit hyperactivity disorder (ADHD). She stated he suffered from trauma he experienced prior to detention and he struggled in school but he had "the ability to learn," noting that "once he can overcome this trauma and have safety and stability, that he can overcome this and he has the ability

16

to learn." She testified the minor's behavioral problems were short-term, often occurring around visits with mother, and reiterated that he would be able to overcome those problems "as he gains stability and safety and that type of structured environment." She opined that the minor did not demonstrate any behaviors that required a higher level of care and he was currently in a foster home that was trained and had the tools needed to help him.

Regarding his previous placements, the social worker testified the minor had been in four different foster homes and two respite placements. The first home was an emergency placement. The second was supposed to be long-term but the minor was moved due to an investigation of the foster family. The third foster family wanted to adopt the minor but then took in two other foster children (in addition to their two biological children and the minor) and decided they preferred to be an emergency placement rather than to adopt any children. The minor was put in a respite placement and, when he returned to the third home, his caretakers submitted their 7-day notice after determining they "could not deal with his behaviors" in addition to the four other children in the home.

The social worker testified she determined that, while the minor got along with older and younger children, he needed to be in a placement where there were no other children when his third placement gave their notice. She testified the minor was the only child in his current (fourth) placement, where his caretakers, who were made fully aware of the minor's behaviors at school and in the home, had committed to not bringing other children into the home. She admitted the minor was still having some difficulties in his current placement (e.g., having issues communicating with the foster father, refusing to do anything the foster father said, and calling his foster father names), but noted those behaviors were due to the fact that the minor viewed the foster mother as a caretaker but viewed the foster father more as a peer. She stated the minor's anxiety was often due to concern about where he would be placed and how his mother was doing. She also

17

confirmed the minor's caretakers were not the only family willing to work with him and she had no doubt she would be able to find another family if placement with the current family and the Colorado relatives fell through, noting there were three other agencies that had families willing to work with him and willing to adopt him "based on his behaviors . . . [t]hey knew about all of the behaviors that he had in the prior home and what happened to him prior to their placement with him."

The record makes plain that the minor became upset and anxious and acted out after visits with mother and Ashley, when mother and Ashley argued, when he began unsupervised visits with mother, when mother was late or failed to follow through with his medical appointments or show up for visits, when mother appeared "high" when she dropped him off at school, and when mother discussed court issues with the minor and behaved inappropriately in an attempt to influence him during visits. When the minor was in placement and had some structure and his contact with mother was restricted, his aggression and acting out decreased, he was less anxious, and he showed marked improvement in school and at home. As the court noted, "given a stable, structured environment and with continued supportive services," the minor would be able to overcome many of the identified issues.

The court found the minor was currently in a home with caregivers who were willing to adopt him and there were also extended family members in Colorado who wanted to adopt him. The fact that the caretakers expressed their desire to adopt the minor demonstrated that the issues the minor was experiencing would not be likely to deter the caretakers from adopting him. (*In re Lukas B., supra*, 79 Cal.App.4th at p. 1154.) Although mother argues the minor had been in numerous placements previous to his current foster home, the evidence shows that the minor was "likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*." (*In re Sarah M., supra*, 22 Cal.App.4th at p. 1650.)

18

Finally, we reject mother's claim of error based on the fact that relevant information the social worker failed to include in her reports only came to light at the section 366.26 hearing. The juvenile court considered the Department's various reports, along with the service logs, and heard the testimony of the social worker, who was subject to cross-examination. Evidence regarding the minor's behavioral issues and emotional state, and regarding the various placement options, was before the court when it made its adoptability finding. Based thereon, the court found there was clear and convincing evidence that the minor was likely to be adopted within a reasonable time. While mother may and does take a different view of the evidence, we conclude the adoptability finding was supported by substantial evidence and it is therefore "irrelevant that there may be evidence which would support a contrary conclusion." (*In re K.B., supra*, 173 Cal.App.4th at p. 1292.)

There was sufficient evidence to support the juvenile court's finding the minor was adoptable and would be adopted within a reasonable time.

II

*Placement*

Mother contends the juvenile court committed prejudicial error when it failed to consider placement of the minor with Ashley before terminating parental rights. She claims the law required that Ashley be considered as a relative placement first before the Department placed the minor in a respite home and then in his fourth foster home.

As we shall explain, mother lacks standing to assert her challenge, but in any event, the juvenile court did not abuse its discretion in placing the minor with the foster caretakers.

Standing to raise a particular issue on appeal depends on whether the person's rights were injuriously affected by the judgment or order appealed from. (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1034-1035 (*Cesar V.*); accord *In re*

*Vanessa Z.* (1994) 23 Cal.App.4th 258, 261.) A person does not have standing to urge errors on appeal that affect only the interests of others. (*In re Gary P.* (1995) 40 Cal.App.4th 875, 877.) Accordingly, a parent is precluded from raising issues on appeal that do not affect his or her own rights. (*In re Jasmine J.* (1996) 46 Cal.App.4th 1802, 1806.)

In dependency proceedings, a parent's interest is in reunification and in maintaining a parent-child relationship. (See *In re Devin M.* (1997) 58 Cal.App.4th 1538, 1541.) While reunification efforts are ongoing, parents generally have standing on appeal to raise issues concerning relative placement. This is because one of the rationales for placing children with relatives is that, during reunification, "[a] relative, who presumably has a broader interest in family unity, is more likely than a stranger to be supportive of the parent-child relationship and less likely to develop a conflicting emotional bond with the child." (*In re Baby Girl D.* (1989) 208 Cal.App.3d 1489, 1493.)

On the other hand, when reunification is no longer being pursued, a parent is not grieved by placement determinations. Thus, the court in *Cesar V.* held that "a parent does not have standing to raise relative placement issues on appeal, where the parent's reunification services have been terminated. (*Cesar V., supra*, 91 Cal.App.4th at p. 1035.) This is because decisions concerning placement of the child do not affect the parent's interest in reunification, where the parent is no longer able to reunify with the child." (*In re A.K.* (2017) 12 Cal.App.5th 492, 499 (*In re A.K.*); see *In re Isaiah S.* (2016) 5 Cal.App.5th 428, 435-436.)

Here, the juvenile court denied reunification services to mother at the contested 12-month review hearing on October 31, 2019. The section 366.26 hearing occurred eight months later, on June 18, 2020. Thus, mother had no interest in the possible future placement of the minor with Ashley. Having failed to establish that her rights and interests were injuriously affected by placement of the minor with the foster caretakers, mother lacks standing to raise the alleged error on appeal.

20

Mother argues the law provides that the relative placement preference still applies to placements made after the dispositional hearing, even when reunification services have been terminated, "whenever a child must be moved." (§ 361.3, subd. (d); see *In re A.K., supra*, 12 Cal.App.5th at p. 498; *Cesar V., supra*, 91 Cal.App.4th at pp. 1031-1032.) She further argues *Cesar V.* held that relatives must "be assessed and considered favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child." (*Cesar V.*, at p. 1033.) These are both correct statements of the law.

However, mother asserts that the father in *Cesar V.* was found to have no standing "because he had stipulated to the termination of his parental rights, and therefore, his interest in the placement of his child thereafter was irrelevant" and "he was not injuriously affected," whereas mother objected to the termination of her parental rights and argued that doing so before any consideration of Ashley as a relative placement injuriously affected *her* (*mother's*) parental rights. That is, mother argues, placing the minor with Ashley could have altered the outcome for mother because it would have allowed her to retain parental rights over the son she loved but with whom she could not reunify. Again, mother's argument has no merit.

As a preliminary matter, mother misstates the facts in *Cesar V.* There, the father stipulated to termination of his *reunification services*, not termination of his parental rights. (*Cesar V., supra*, 91 Cal.App.4th at p. 1035.) Indeed, the father's parental rights remained intact. The issue before the court of appeal was "whether the relative placement preference applies when a new placement becomes necessary after reunification services are terminated but before parental rights are terminated and adoptive placement becomes an issue." (*Id.* at p. 1032.) Addressing the petition for extraordinary writ filed by the paternal grandmother Elvia and the father challenging the juvenile court's placement order, the appellate court found that, given the stipulated termination of services, the father had no standing to appeal the relative placement

preference issue, although he was not precluded from presenting evidence of the minors' best interests or their relationship with him. The court further found that, because Elvia "properly placed the issue" of relative placement before the court, and the father formally joined in her arguments and "extensively litigated the issue below" (in part by filing a section 388 petition), the father "will be permitted to support Elvia's position with arguments of his own." (*Id.* at pp. 1034-1035.)

We reach a different result under these facts. As previously noted, mother's reunification services were terminated on October 31, 2019. Ashley stated she was not able to care for the minor in December 2018. Then, over one year later, she reportedly changed her mind and stated she wanted to act as the minor's guardian. The minor was moved to his fourth placement, a foster home, on May 5, 2020. Unlike the paternal grandmother in *Cesar V.,* who along with the father sought extraordinary relief from the court's placement order, Ashley did not challenge the placement order, nor does she appeal from the juvenile court's orders after the section 366.26 hearing. Thus, Ashley did not place the issue before us and mother, who unlike Cesar did not "extensively litigate[] the issue below," has no standing either on her own or in conjunction with Ashley. (*Cesar V., supra,* 91 Cal.App.4th at p. 1035.)

We find unavailing mother's conclusory claim that placing the minor with Ashley could have altered the outcome for mother because it would have allowed her to retain parental rights over the minor even though she could not reunify with him. Exceptions to the general rule regarding a parent's standing exist when the placement may affect the decision whether to terminate parental rights. (See *In re H.G.* (2006) 146 Cal.App.4th 1; *In re Esperanza C.* (2008) 165 Cal.App.4th 1042.) Such is not the case here. As the Department aptly notes, mother failed to set forth any credible evidence that placement of the minor with Ashley would have prevented the court's termination of parental rights. Mother had a long history of chronic substance abuse and untreated mental health issues. She failed to engage in reunification services and, after those services were terminated in

22

October 2019, she continued to struggle with her sobriety and the consequences of her addiction. She was arrested in January 2020 for identity theft. At that time, she also had pending criminal charges for possession of a controlled substance and hit and run. Her visitation with the minor was at times consistent, but she repeatedly discussed inappropriate topics with him and made no attempt to de-escalate him when his behaviors escalated. She was unable or unwilling to address the issues that brought the minor to the Department's attention, and she continued to struggle with making appropriate relationships and setting boundaries with her adult children. Under those circumstances, termination of parental rights was almost inevitable.

We conclude, for the reasons set forth, *supra*, that mother did not have standing to raise the issue she argues here and, on that basis, we reject that argument.

## DISPOSITION

The juvenile court's orders are affirmed.

_____
HULL, J.

We concur:

_____
BLEASE, Acting P. J.

_____
ROBIE, J.

23