Filed 10/19/23  In re M.G. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re M.G. et al., Persons Coming Under the Juvenile Court Law | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  S.M.,  Defendant and Appellant. | E081082  (Super.Ct.Nos. J284710 & J284711)  OPINION |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed in part; conditionally reversed in part with directions.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, Pamela J. Walls, Special Counsel for Plaintiff and Respondent.

1

Defendant and appellant S.M. (Mother) appeals after the termination of her parental rights to M.G. (born July 2019) and D.G. (born July 2012; collectively, the Children) at a Welfare and Institutions Code section 366.26[1] hearing. Mother contends on appeal that (1) the juvenile court's ruling that the Indian Child Welfare Act of 1978[2] (ICWA) did not apply must be reversed for the failure of plaintiff and respondent San Bernardino County Children and Family Services (the Department) to adequately perform its duty of notice; (2) the juvenile court failed to properly consider relative placement pursuant to section 361.3; and (3) the juvenile court erred by finding the beneficial-parental bond exception to termination of parental rights did not apply..

## FACTUAL AND PROCEDURAL HISTORY

A.     DETENTION

On March 27, 2020, the Department received an immediate response referral alleging severe neglect and caretaker absence by Mother and presumed father J.G. (Father; collectively, Parents) for the Children. It was reported that Father had covered windows in the bedroom occupied by him, Mother, and the Children with foil and had a car engine that was exuding a strong odor in the room without any ventilation. Law enforcement was called to the premises based on a domestic dispute. D.G. was found in the closet wearing only a large men's shirt; M.G. was in her car seat. The room was

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]  "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

"filthy." There was trash and tools on the floor, including a kitchen knife, gun ammunition and a broken sex toy, which were all within reach of the Children. Father told officers who responded to the residence that he got into an argument with his sister C.G. (Sister), because she insisted on opening windows. He told her he had to keep the windows shut because the "Cartel" wanted to kidnap and rape the Children. The bedroom where the Children were located was uninhabitable.

The Children were transported to the hospital and were placed on oxygen based on being exposed to " 'high levels of hazardous chemicals containing a volatile combination.' " Parents were arrested for child endangerment.

D.G. reported that she and her family could not stay in one place for too long because Father believed the Cartel would find them and hurt the Children. D.G. felt unsafe without Parents because she believed the Cartel would find her. D.G. had seen Parents use drugs. Parents oftentimes yelled at each other but did not engage in physical violence. D.G. reported that she had not eaten since the prior morning. On March 27, 2020, the Children were detained and placed with a non-related extended family member, T.F.; D.G. reported to T.F. that it burned and hurt when she urinated. The Department ordered a sexual assault exam but no abuse was evident.

The Department filed section 300 petitions for the Children against Parents on April 1, 2020. It was alleged in the petitions under section 300, subdivision (b), failure to protect that Parents suffered from unresolved substance abuse problems and mental health problems, which put the Children at substantial risk of serious physical harm abuse or neglect; the Children had been exposed to domestic violence between Parents; and

3

Parents had failed to provide adequate care and shelter for the Children. It was alleged as to both Parents that they had been incarcerated at the Glen Helen Rehabilitation Center on March 27, 2020, and left the Children without any provisions for support. It was alleged pursuant to section 300, subdivision (b), and (c), as to D.G. only, that she had suffered serious emotional damage due to Parents advising her that she was at risk of sexual assault or abduction by fictitious individuals.

A detention hearing was held with Mother present on April 2, 2020; a second hearing with Father present was held on April 8, 2020. The juvenile court found a prima facie case that the Children came within section 300 and that detention should be outside the home. Mother requested that the Children be placed with paternal grandmother (PGM) or maternal grandfather (MGF) but she had no contact information. Father wanted MGF to be assessed for placement. Parents denied any Indian ancestry.

Parents provided Family Find and ICWA Inquiry forms. They both provided the name of MGF for possible placement. Both denied any Indian ancestry on their ICWA-020 forms. The Department had been provided names of relatives and was continuing inquiry of those relatives for possible placement.

B.     JURISDICTION/DISPOSITION REPORT AND HEARING

The jurisdiction/disposition report was filed on June 13, 2020. The Department recommended that the Children remain out of the home and that reunification services be granted to Parents. Parents were both incarcerated and could not be interviewed.

T.F. reported that Mother, Father and the Children had been living with her for the prior eight years. T.F. had provided food and clothing for the family and they had not

4

paid her. T.F. reported that Parents had started to isolate the Children in their bedroom and did not allow T.F. to interact with the Children. She told them they had to move out. T.F. had heard Parents tell D.G. that people were following her and electronically raping her. D.G. was scared to sleep alone and started wetting her bed. On one occasion, D.G. went into the bathroom, took off all of her clothes, and urinated on them. T.F. provided further information to the Department that D.G. had informed T.F. the Parents put foil down D.G.'s pants and covered M.G.'s car seat with foil.

D.G. had been interviewed. She believed that while she was driving in her car with Parents, aircraft were attacking her car by throwing "stuff at us." Persons on motorcycles were chasing them. Mother had pled guilty to child endangerment on July 28, 2020, and had been placed on probation. Father was still incarcerated.

The jurisdiction/disposition hearing was held on July 28, 2020. Parents were not present. The juvenile court adopted all the findings and orders in the jurisdiction/disposition report. Father was named the presumed father of the Children. The juvenile court found that ICWA did not apply. Reunification services were granted for Parents. All of the allegations in the section 300 petitions filed for the Children were found true.

C.   REVIEW REPORTS AND HEARINGS

The Department filed a six-month review report on January 19, 2021. It was recommended that reunification services be continued and that the Children remain in the home of T.F. No new ICWA information had been received during the reporting period.

5

No relatives had come forward to request placement of the Children. Parents requested that the Children reside with T.F. There were no pending assessments with relatives.

Parents had been released from custody and rented a room in Eastvale. Mother had completed some of her parenting classes and domestic violence classes. Mother was participating in substance abuse treatment. Father was on probation for his conviction of felony child endangerment. Father was referred for services but the Department had not received progress reports from any service providers. Parents had negative drug tests during the reporting period. Mother frequently visited with the Children. Paternal grandparents had also visited the Children.

T.F. reported that D.G. was very needy and had trouble sleeping. She frequently wet her bed. D.G. had been physically aggressive toward T.F. D.G. was receiving therapy services. M.G. had been medically evaluated and found to have a hole in her heart, which would require monitoring. T.F. did not think that she could adopt or be the legal guardian for the Children because she was in her 70s; she wanted a friend of hers, who was like a daughter, to be given custody of the Children. The juvenile court continued reunification services at the six-month review hearing.

In its 12-month review report filed on April 26, 2021, the Department recommended that reunification services for Parents be continued for an additional six months. No new ICWA information was provided. Parents continued to request that the Children stay in the custody of T.F. but the Children needed to be placed in a concurrent planning home.

Mother offered that the Children could be placed with maternal great-grandmother (MGGM) in Arizona. The Department reached out to MGGM, who stated she was in her 70s and would not be willing to provide permanent placement for the Children. Father requested that paternal grandfather (PGF) be considered for placement. PGF lived in a one-bedroom apartment, worked full time and had health issues according to Father. Father recommended that M.G.'s current babysitter live with PGF to assist him but the Department stated that the one-bedroom apartment for four people was not adequate. PGM contacted the Department regarding placement. PGM was told to provide her information to the assessment unit. Father objected to PGM having custody as she had been mean to D.G. in the past and lived with Father's stepfather, who had a criminal history. PGM also disclosed possessing an unfenced swimming pool.

No other family members had come forward to take custody of the Children. D.G. was receiving "Wraparound" services. Mother had been coming to T.F.'s home and sitting with D.G. during the day while D.G. attended online school, and worked with her on homework after school was over for the day. D.G.'s grades had improved since Mother started sitting with her. A permanent home was not being sought for the Children as the Department hoped that they would reunify with Parents.

Mother had made progress in her services, nearing completion of her substance abuse treatment program, completing individual therapy and continued to participate in child abuse classes. The juvenile court continued reunification services for an additional six months at the 12-month review hearing held on May 12, 2021.

On June 29, 2021, the Department provided additional information that Mother had a positive drug test for cocaine on June 17, 2021, and a positive test for alcohol on June 23, 2021. Mother had already completed a substance abuse treatment program; she reenrolled in a substance abuse program based on the relapse.

In the 18-month review report the Department recommended that reunification services for Parents be terminated. It was further recommended that the Children remain in T.F.'s care with a permanent plan of adoption. No further ICWA information had been reported. Mother was living with relatives. Parents were not together and Father did not want Mother's assistance in caring for the Children. Mother had not completed her case plan. D.G. was still having behavior problems and continued to receive services. The Department had attempted to include Parents in Wraparound services but they had not attended.

As for placement with relatives, the Department provided "Although there appears to be maternal and paternal family members, none appeared willing or able to provide permanency for the children. Several relatives stated that they would accept placement to assist the parents but were not willing to provide permanency for the children, citing their ages or health conditions. [PGM] stated that she has an unfenced swimming pool and the father reported that paternal step-grandfather had returned to the home and has a criminal history. The mother previously reported that she is not close to any family members although she stated that she recently moved to Anaheim to live with MGF and a maternal uncle (A.M.). However, they reportedly are planning to move to Arizona later this year. The paternal grandfather reportedly lives in a 1-bedroom apartment and works full-time.

8

He did not have adequate childcare for the children. Additionally, he experiences some health concerns that could hamper his ability to provide adequate care of the children. The parents have not disclosed any other relatives or friends for placement consideration."

The Department provided additional information that Mother was participating in her outpatient substance abuse treatment program and had attended six of her required eight therapy appointments. Parents continued to live separately. Mother consistently visited with the Children. T.F. was willing to be the legal guardian for D.G. but stated she was too elderly to care for M.G.

The contested 18-month review hearing was held on December 15, 2021. The juvenile court authorized the initiation of an ICPC for a maternal uncle in Michigan (S.L.). Reunification services were terminated for Parents. The juvenile court was concerned that Mother had relapsed and had not completed her case plan even though it had been 18 months since the Children had been detained.

According to an additional report filed on January 21, 2022, PGM had again contacted the Department regarding placement of the Children. She had not addressed the unfenced pool. The Department also spoke with S.L. No further progress on the assessment had been made. The Department again spoke with MGM, who lived in Arizona. She was 77 years old and did not feel she could care for the Children. The Department summarized contacts with other family members who all expressed that they were not interested in permanent placement of the Children or had unresolved problems, which foreclosed placement of the Children. Father opposed placement with PGM.

9

A hearing was conducted on February 4, 2022. Mother was not present. Mother's counsel argued that the relatives needed to be assessed for placement since T.F. was not able to adopt the Children. The juvenile court excluded MGGM, PGF, A.M., MGM, and Father's girlfriend as possible placement under the criteria of section 361.3. Mother objected to her relatives being ruled out for placement. The court reserved ruling on placement with S.L.

D.  SECTION 366.26 REPORT AND HEARING

The section 366.26 report was filed on April 4, 2022. The Department recommended that the matter be continued until an adoptive home could be located. The assessment of S.L. was ongoing. D.G. was depressed and was not eating because she became aware she was being moved from T.F.'s care. She did not want to live with strangers. An update was provided on April 8, 2022, that S.L. no longer wanted placement of the Children.

At a hearing on April 14, 2022, the juvenile court made ICWA inquiry of family members who were in attendance. MGGM advised the juvenile court that her mother would tell her that she was part Indian, but she was not sure what tribe. MGGM's mother grew up in New Mexico. She was unaware of anyone in her family applying to be a member of any Indian tribe. MGF confirmed MGGM's statements, but had no other information and was aware of no supporting documentation. The section 366.26 hearing was continued.

An addendum to the section 366.26 report was filed on May 2, 2022, again seeking a continuance. An adoptive home had been located but it would take time to

10

transition the Children to the home. MGGM withdrew her claim that she had Indian heritage based on having no documentation. She just assumed the family had Navajo affiliation based on the family being in New Mexico. There were no relatives alive to ask and she would not provide any further relative information. MGF was contacted and he stated that he did not have any way to prove Indian ancestry. He did not have contact information for other relatives. At the next hearing to continue the section 366.26 hearing, S.L. was found not to be appropriate for placement as he no longer wanted to take custody of the Children. Mother requested a bonding study, which was granted. The Children were moved to a prospective adoptive home on May 29, 2022.

A subsequent section 366.26 report was filed on August 17, 2022. It was recommended that parental rights be terminated and the Children be freed for adoption. The Children had been moved to the prospective adoptive home. The Department also sought an order that ICWA did not apply. MGGM only "jokingly" made comments regarding Indian heritage and everyone else denied any heritage. D.G. was having a hard time transitioning into the adoptive home; she missed T.F. However, D.G. understood that the new placement was necessary. M.G. was adjusting well to the new caregivers. Mother had been consistent in visitation and the Children seemed to enjoy the visits. At a hearing before the section 366.26 hearing, paternal grandparents were asked about Indian heritage and denied that there was any in the family.

The Department provided additional information to the juvenile court before the section 366.26 hearing. The Children had bonded to the adoptive family. D.G. was

11

interacting well with her adoptive parents and wanted them to adopt her. The hole in M.G.'s heart had closed and it required no further medical attention.

A bonding study was conducted by Dr. Elizabeth Stanton, a licensed psychologist, for Mother and the Children. Mother had been separated from the Children since March 2020. Dr. Stanton observed several visit between Mother and the Children. M.G. sat on Mother's lap and was happy. D.G. let Mother braid her hair and sat on Mother's lap. Mother brought toys, games and food to the visits. They all laughed together. When ending visits, "[the Children] were not overly emotional when leaving Mother, nor did they seem eager to leave her." Dr. Stanton reported that considering the relationship between Mother and the Children, "severing contact could be detrimental." The "healthy (secure) attachment pattern" between Mother and the Children should be considered when making a permanent plan.

Additional information regarding ICWA was provided to the juvenile court on December 2, 2022. The Department noted that Parents had denied Indian ancestry. A.M. and MGF had denied Indian ancestry. The paternal grandparents, a paternal uncle and a paternal aunt had denied Indian ancestry. The Department had sent email notice to the Navajo Nation. On November 21, 2022, the Department received notification from a social worker with the Navajo Indian Child Welfare Act Program in regards to the Children, stating the Navajo Nation was in the process of verifying whether the Children were enrolled or eligible for enrollment. On November 17, 2022, a vital statistics technician with the Navajo Nation informed the Department that no record was found for Mother, Father, or the Children. The technician recommended that the Department

submit a name, date of birth or tribal census number of the person claiming heritage. The section 366.26 hearing was continued several times in order to clarify the information from the Navajo Nation.

On February 14, 2023, the Department provided further information to the court regarding the notices to the Navajo Nation. The Navajo Nation had not completed its research as the Department provided the names of MGM and MGGM, which needed to be researched. The matter was continued awaiting notice. An email was received on March 22, 2023, by the Department from the Navajo Nation that the Children were not enrolled nor eligible for enrollment.

The contested section 366.26 hearing was conducted on April 6, 2023. The juvenile court concluded that ICWA did not apply. The parental rights of Parents were terminated, and the Children were freed for adoption.[3]

## DISCUSSION

### A.    ICWA NOTICE

Mother contends the Department's failure to send formal notice by preparing and sending an ICWA-030 form to Indian tribes, the Bureau of Indian Affairs (BIA) and Secretary of the Interior rendered the juvenile court's finding that ICWA did not apply erroneous. Mother insists that the Department's emails to the Navajo Nation were inadequate notice. Remand in order for the Department to provide formal notice is required. The Department insists that it, and the juvenile court, did not have a "reason to

---

[3] The details of the section 366.26 hearing will be provided in our Discussion, *post.*

13

know" that the Children had Indian ancestry. Accordingly, no formal ICWA-030 notice was required and the juvenile court properly determined that ICWA did not apply after further inquiry by the Department. The resolution of this claim depends on whether the juvenile court had "reason to believe" or "reason to know' the Children had Indian ancestry.

"ICWA provides: 'In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child, . . . shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention.' [Citation.] ICWA also requires child welfare agencies to notify the [BIA] of the proceedings, if the juvenile court knows or has reason to know the child may be an Indian child but the identity of the child's tribe cannot be determined." (*In re N.G.* (2018) 27 Cal.App.5th 474, 479-480, fns. omitted.) " 'ICWA itself does not impose a duty on courts or child welfare agencies to inquire as to whether a child in a dependency proceeding is an Indian child.' . . . [¶] . . . 'ICWA provides that states may provide "a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under" ICWA.' " (*In re J.S.* (2021) 62 Cal.App.5th 678, 685.)

Pursuant to California law, "An initial 'duty of inquiry applies to every "child for whom a petition under Section 300, 601, or 602 may be or has been filed" [citation],' the 'duty of further inquiry applies when there is a "reason to believe that an Indian child is

14

involved [or, under Cal. Rules of Court, rule 5.481(a)(4), 'may be involved'] in a proceeding" [citation],' and 'the duty to provide notice to Indian tribes applies only when one knows or has a "reason to know . . . an Indian child is involved." ' " (*In re J.S.*, *supra*, 62 Cal.App.5th at p. 688.)

"[I]f the court or the agency has 'reason to know' an Indian child is involved, ICWA notices must be sent to the relevant tribes." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 742.) "[T]he notice to a tribe must include a wide range of information about relatives, including grandparents and great-grandparents, to enable the tribe to properly identify the children's Indian ancestry. [Citation.] Any violation of this policy requires the appellate court to vacate the offending order and remand the matter for further proceedings consistent with ICWA requirements." (*In re A.M.* (2020) 47 Cal.App.5th 303, 317.)

On the other hand, if the juvenile court only has a reason to believe that a child has Indian ancestry, additional inquiry is required but not formal notice. Section 224.2, subdivision (e)(2) provides, "When there is reason to believe the child is an Indian child, further inquiry is necessary to help the court, social worker, or probation officer determine whether there is reason to know a child is an Indian child. Further inquiry includes, but is not limited to, all of the following: [¶] (A) Interviewing the parents, Indian custodian, and extended family members to gather the information required in paragraph (5) of subdivision (a) of Section 224.3. [¶] (B) Contacting the [BIA] and the State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member, or eligible for membership

15

in, and contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership status or eligibility. [¶] (C) Contacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility. Contact with a tribe shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under the federal Indian Child Welfare Act of 1978 (25 U.S.C. Sec. 1901 et seq.). Contact with a tribe shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." "[T]he 'reason to believe' standard requiring further inquiry concerning a child's possible status as an Indian child should be broadly interpreted." (*In re T.G.* (2020) 58 Cal.App.5th 275, 296.)

" ' "The juvenile court must determine whether proper notice was given under ICWA and whether ICWA applies to the proceedings." ' [Citation.] 'If the court makes a finding that proper and adequate further inquiry and due diligence as required in [section 224.2] have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence.' " (*In re Y.W.* (2021) 70 Cal.App.5th 542, 552; see also *In re A.M.*, *supra*, 47 Cal.App.5th at p. 314.)

The information before the juvenile court was that Parents, paternal grandparents, a paternal uncle and a paternal aunt had denied Indian ancestry had all denied Indian ancestry. At a hearing, MGGM provided that her mother had discussed that she had

16

Indian ancestry. She was unsure of the tribe. MGGM later stated that she was not sure that she could prove Indian ancestry and that she wanted to withdraw her comments. However, she disclosed that she presumed that her mother was part of the Navajo Nation because she grew up in New Mexico. This was sufficient for the juvenile court to have reason to "believe" that the Children may be Indian children. This triggered only a duty of further inquiry under section 224.2, subdivision (e).

There was no "reason to know" that the Children had Indian heritage. MGM had some vague recollection that her mother had been part of the Navajo Nation but had no further information. The remainder of the family denied Indian ancestry. Formal notice by way of sending ICWA-030 forms was not required because there was only a reason to believe and not a reason to know the Children were Indian children. (*In re A.M.*, *supra*, 47 Cal.App.5th at pp. 321-322.)

It appears from the record before this court that the Department sent emails to the Navajo Nation inquiring whether the Children or Parents were part of the tribe. Other relatives' names were provided to the Navajo Nation. The Navajo Nation responded that they researched the information and concluded there was no record of the Children or Parents. The Department also reached out to other relatives regarding whether the Children had any Indian ancestry, which they denied. However, there is no indication in the record that the Department contacted the BIA, as required by section 224.2, subdivision (e)(2)(B). "[T]he burden of making an adequate record demonstrating the court's and the [Department's] efforts to comply with ICWA's inquiry and notice requirements must fall squarely and affirmatively on the [juvenile] court and the

17

[Department]. In the absence of an appellate record affirmatively showing the [juvenile] court's and the [Department]'s efforts to comply with ICWA's inquiry and notice requirements, we will not, as a general rule, conclude that substantial evidence supports the court's finding that proper and adequate ICWA notices were given or that ICWA did not apply. Instead, as a general rule, we will find the appellant's claims of ICWA error prejudicial and reversible." (*In re N.G.* (2018) 27 Cal.App.5th 474, 484.)

While we disagree with Mother on this record that ICWA-030 notices had to be sent because there was reason to know the Children had Indian ancestry; since there was reason to believe the Children may have Indian ancestry, the Department was required by section 224.3, subdivision (e)(2)(B), to make further inquiry with the BIA. The record only supports that the Department contacted relatives and the Navajo Nation. Although MGM mentioned the Navajo Nation, she only presumed this was the relevant tribe since her mother had lived in New Mexico. MGM was not certain of the tribe and such ambiguity necessitated that the Department contact the BIA for assistance. As such, limited remand is necessary for the Department to provide information that it made further inquiry with the BIA as to all tribes, and if not, to make such inquiry. If such inquiry results in a determination by the juvenile court that there is reason to know that the Children have Indian ancestry, then formal notice should be provided by the juvenile court.

## B.    RELATIVE PLACEMENT

Mother insists this court should find that the Department and the juvenile court committed mistakes and misunderstanding of the law by circumventing the requirement

18

to immediately and properly assess placement of the Children with relatives pursuant to sections 309 and 361.3. Mother insists that the Department had to refer all known relatives to the Resource Family Approval (RFA) process rather than recommending that the relatives not be considered for placement based on the Department's own assessment. The juvenile court's placement of the Children in a non-related adoptive home at the section 366.26 hearing should be reversed. The Department contends that Mother has no standing on appeal to claim that the trial court erred by failing to submit relatives for RFA approval, and the appeal of the issue is untimely.

Section 361.3, subdivision (a) provides, "In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative, regardless of the relative's immigration status." "The section 361.3 relative placement preference requires 'preferential consideration' be given to a relative's request for placement of a dependent child. [Citation.] This section protects a relative's 'separate interest' in a relationship with the child. [Citation.] In contrast, a parent's interest in a dependency proceeding is in reunifying with the child." (*In re A.K.* (2017) 12 Cal.App.5th 492, 499 (*A.K.*).) The RFA process is a unified approach for licensing foster homes, approving relatives as caregivers, and approving guardians and adoptive families. (§ 16519.5, subd. (a).)

" '[W]hether one has standing in a particular case generally revolves around the question whether that person has rights that may suffer some injury, actual or threatened.' " (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1034.) "Not

19

every party has standing to appeal every appealable order. Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a decision may appeal. [Citations.] An aggrieved person, for this purpose, is one whose rights or interests are injuriously affected by the decision in an immediate and substantial way, and not as a nominal or remote consequence of the decision." (*In re K.C.* (2011) 52 Cal.4th 231, 236; see also *A.K.*, *supra*, 12 Cal.App.5th at p. 499 ["A person does not have standing to urge errors on appeal that affect only the interests of others"].)

"[W]here the parent's reunification services have not been terminated, placement of the child with a relative arguably affects the parent's chances of reunifying with the child. Thus, where reunification remains a possibility, the parent has standing to raise relative placement issues on appeal." (*A.K.*, *supra*, 12 Cal.App.5th at p. 499.) However, "a parent does not have standing to raise relative placement issues on appeal, where the parent's reunification services have been terminated." (*Ibid.*; see also *In re Jayden M*. (2014) 228 Cal.App.4th 1452, 1460 ["[o]nce a parent's reunification services have been terminated, the parent has no standing to appeal relative placement preference issues"].)

Here, reunification services for Mother have been terminated. Additionally, at the section 366.26 hearing, Mother only argued against the termination of parental rights based on the beneficial parent relationship exception. She did not argue about the placement of the Children. Placement with a relative rather than the non-related adoptive family would not have had an impact on the termination of her parental rights. Mother has failed to show that the placement orders impacted the considerations relevant to the

20

termination of her parental rights, and as such, Mother does not have standing to raise the issue and we decline to address the merits of her arguments.

## C. BENEFICIAL PARENT EXCEPTION TO SECTION 366.26

Mother contends the juvenile court failed to apply the standards set forth in *In re Caden C.* (2021) 11 Cal.5th 613 (*Caden C.*) in finding that the parental benefit exception did not apply and reversal of the orders at the section 366.26 hearing are required.

### 1. *ADDITIONAL FACTUAL BACKGROUND*

At the section 366.26 hearing, in arguing for the juvenile court to apply the parental benefit exception, Mother's counsel argued that Mother had relapsed in the case but had always been consistent with visitation. Mother had significant contact with the Children when they were in T.F.'s care. Mother was instrumental in keeping D.G. on track while she had to do online school due to the COVID pandemic. D.G. had mixed emotions about being adopted but she understood it was in her best interest.

The juvenile court found that Mother was consistent in visitation, the Children enjoyed the visits, and Mother was appropriate during the visits. D.G. was 10 years old and M.G. was three years old. D.G. had been working hard to adjust to her new home. The juvenile court referred to the bonding study and noted that the visits between the Children and Mother had been positive. The juvenile court also recognized that Dr. Stanton had stated severing contact between the Children and Mother *could* be detrimental. The juvenile court also noted that Mother had taken responsibility for her actions and understood she had made a huge mistake.

21

The juvenile court indicated that the question before the court at the section 366.26 hearing was not whether Mother could resume custody of the Children, but rather the goal was to implement a permanent plan for the Children. There was clear and convincing evidence that the Children were likely to be adopted. Based on the Children being adoptable, and that reunification services were terminated, the juvenile court ruled that parental rights would be terminated. As for the parental benefit exception, the juvenile court focused on the Children' best interests and whether the detriment from severing parental rights outweighed the safety and security of being adopted into a new family.

The juvenile court then focused on the elements set forth in *Caden C.* Mother met the first prong by having consistent visitation with the Children. The juvenile court found that Mother had not met her burden on the second and third prongs of *Caden C.*, finding that while there was a relationship between the Children and Mother, there was insufficient evidence that the continuation of the relationship would benefit the Children to such a degree that termination of parental rights would be detrimental to the Children. M.G. had spent the majority of her life outside the custody of Mother. D.G. understood that adoption provided her permanency. The juvenile court found that Dr. Stanton had stated that severing contact between the Children and Mother "could" be detrimental to the Children—it was not definitive. The juvenile court denied a lesser plan of legal guardianship. The juvenile court terminated parental rights and freed the Children for adoption.

2.	*ANALYSIS*

" 'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.] 'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).' " (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224-1225.) In order to prove that the parental bond exception applies, a parent must show (1) consistent visitation; (2) a beneficial relationship; and (3) detriment to the children in losing that relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 635.)

"A parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) However, "Issues such as those that led to dependency often prove relevant to the application of the exception. . . . A parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child." (*Ibid.*)

"[C]ourts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) "A child would benefit from continuing a strong, positive, and affirming relationship, and it would be destabilizing to lose that relationship. Sometimes, though, a relationship involves tangled benefits and burdens.

23

In those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Ibid*.) "[C]onsideration of the beneficial relationship exception is a 'fraught determination' that requires the juvenile court to 'sift through often complicated facts to weigh competing benefits and dangers for the child[,] . . . consider practical realities over which it has limited control and envision a child's future under contingent conditions." (*In re J.D.* (2021) 70 Cal.App.5th 833, 869.)

"Bonding studies supply expert opinion about the psychological importance to the child of the relationship with his or her parent(s) to assist the court in determining whether 'the child would benefit from continuing the relationship.' " (*In re M.V.* (2023) 87 Cal.App.5th 1155, 1179.)

"A substantial evidence standard of review applies to the first two elements. The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

Here, the juvenile court had the difficult task of evaluating the relationship that Mother and the Children had, the detriment of severing that relationship, and whether the stability of a permanent home outweighed that detriment. The juvenile court took into account all of the factors in *Caden C.* The juvenile court found that Mother had been consistent in visitation and that Mother had a positive relationship with the Children. It then focused on whether the detriment of severing Mother's parental rights would outweigh the stability of a permanent home.

Here, in finding that Mother had not met the second prong, the juvenile court first focused on the fact the M.G. had spent most of her life out of Mother's custody. Further, although D.G. had expressed being upset with the adoption, and wanted to live with Mother, she understood that adoption was necessary in order to provide stability. The juvenile court properly considered the age of each child, the time they spent in Mother's custody and D.G.'s comment that she understood the stability of the adoptive home was necessary, in finding that it would not be detrimental to sever the parental relationship. (*In re M.V.*, *supra*, 87 Cal.App.5th at p. 1185 [court should evaluate for second prong the age of the children, how much time was spent in the parent's custody and the needs of the children].)

Moreover, the juvenile court also found that Dr. Stanton's report did not include a determinative finding that severing the parental relationship would be detrimental to the Children. Dr. Stanton noted that the Children had been separated from Mother for over

25

two years.  The Children were not overly emotional when the observed visits concluded.[4]

Dr. Stanton concluded that severing parental relationships "could" be detrimental and

"may" present challenges for the Children to have the loss of the parental relationship.

Dr. Stanton concluded that the juvenile court should consider the healthy attachment

when making any determinations as to the future of all parties, but did not recommend

that relationship be maintained.

The juvenile court properly took into account the study by Dr. Stanton and the

factors in *Caden C.* in determining the third prong of beneficial parental relationship did

not apply.  While we recognize that this is a close case, we cannot conclude that the

juvenile court's decision to terminate Mother's parental rights was an abuse of its

discretion.

**DISPOSITION**

The orders terminating parental rights to the Children are conditionally reversed

and the matter is remanded to the juvenile court with directions that the Department

demonstrate whether it inquired of the BIA in accordance with section 224.2, subdivision

(e).  If it did not, the Department shall make further inquiry.  If the juvenile court

determines the Department's inquiry satisfied its affirmative duty of inquiry, then the

juvenile court shall reinstate its section 366.26 orders.

---

[4]  This court recently found in *In re I.E.* (2023) 91 Cal.App.5th 683, 692-693, that evidence the children in that case did not experience distress at the end of visits supported the "juvenile court's conclusion that the relationship was not so substantial that its severance would be detrimental to the child."

If the juvenile court finds that the additional inquiry yields information that there is reason to know that the Children have Indian ancestry, the juvenile court shall order the Department to provide the relevant tribe(s) and the BIA with formal notice of the pending proceedings. In the event no tribe responds indicating the Children are Indian children, or if no tribe seeks to intervene, the juvenile court shall reinstate its section 366.26 orders. If a tribe determines that Minor is an Indian child and seeks to intervene in the proceedings, then the juvenile court shall vacate its prior orders and conduct all proceedings in accordance with ICWA and related California laws. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.

27